[Crim. No. 21136. Feb. 18, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDY HASKETT, Defendant and Appellant.

842

844

COUNSEL

Joseph Shemaria and Joseph F. Walsh for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MOSK, J.**—Defendant Randy Haskett appeals from a conviction of two counts of first degree murder and one count of second degree attempted murder. Because the jury imposed the death penalty, the appeal is automatic. (Pen. Code, § 1239, subd. (b).)

I.

On October 23, 1978, defendant was arrested and charged with the rape, robbery, and attempted murder of his half-sister, Mrs. Gwendolyn Rose, and with the first degree murder of her two sons, Keith and Cameron. The key witness for the prosecution was Mrs. Rose, who testified in substance as follows.

In the morning hours of October 23, Mrs. Rose was awakened when her 11-year-old son Keith returned home after spending the weekend with his grandmother. Her husband had already left for work, but she remained in bed, where her four-year-old son Cameron was also sleeping. Shortly after Keith's arrival, she was awakened again, this time by defendant, who had already entered the house and was apparently in the living room. He identified himself as Randy, and she recognized his voice. He asked her to help him start his car, which he claimed had a dead battery. She responded from the bedroom that she could not help him because she had no cables, but invited him to make himself at home and prepare something to eat.

A few moments later she heard Keith shout that defendant had cut him. She rushed to the living room, where she saw defendant wielding a kitchen knife and observed blood on her son's hand. Defendant then grabbed her hand and told her not to speak or move. He put the children in the bedroom closet, then demanded that Mrs. Rose engage in sex with him. Out of fear, she agreed to capitulate to his sexual demands if he would put the knife down. He did so, but after intercourse he picked it up again and told her he needed money. Again because she was frightened, she emptied her purse on the bed and gave him the contents, slightly over $30. He handed her a pillow case or towel and told her to wipe all the surfaces in the room that he may have touched. After she had finished, he choked, kicked, and repeatedly stabbed her until she sank to the floor motionless. He covered her with a bedspread and went to the closet. Opening the door, he coaxed the boys out, then killed them both by repeated stabbing.

To corroborate Mrs. Rose's testimony, the prosecution offered several photographs of the corpses and of Mrs. Rose's wounds, the testimony of police officers that they discovered $30 in the pocket of a shirt lying under the covers of defendant's bed, several items of blood-stained clothing found in defendant's washing machine and elsewhere at his residence, the testimony of a sheriff's office criminalist that there was evidence of semen in Mrs. Rose's vagina shortly after the assault, and the testimony of Mrs. Rose's sister that she called the Rose residence on the morning of October 23 and spoke briefly to a man identifying himself as Randy.

Defendant testified that on the morning of the killings he had been with his wife and had visited or talked with various friends and rela-

tives, many of whom supported this alibi at trial. He also asserted that the blood stains were a result of an injury he had sustained over a month before the killings.

The jury returned a verdict of guilty on the murder and attempted murder charges, and found true the allegation that a knife was used in the commission of those crimes. It also found true the special circumstance of multiple murder. It was unable to agree on the rape and robbery counts, however; the verdict forms revealed that the jury was evenly divided on the robbery charge and that it split nine to three on the rape charge, with the majority favoring conviction. After polling the jurors individually and thereby determining that further deliberation would be of no value, the judge declared a mistrial on those counts.

## II.

Defendant makes several allegations of error in the guilt phase of trial.

## A.

His first contention is that the evidence is insufficient to sustain the convictions of murder in the first degree. The prosecution presented two theories of first degree murder: premeditation and deliberation, and felony murder. Premeditation and deliberation may be established by proof of a motive for the killing combined with a showing of planning activity or of an exacting method of execution.[1]

---

[1]More precisely, "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a 'pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].)

Several of defendant's actions constituted evidence of planning activity. Defendant was parked outside the Rose residence for several minutes, then entered unannounced and offered a false reason for entry when confronted by Mrs. Rose and her son Keith. He obtained a kitchen knife in advance of the killings, and confined the boys in the closet while assaulting their mother. Moreover, when he forced Mrs. Rose to wipe clean all parts of the room he might have touched, he revealed an intent to leave no traces of his presence. The jury could have interpreted his covering of Mrs. Rose's apparently lifeless body with a bedspread as a calculated attempt to avoid further frightening the boys in order to facilitate their murders. Finally, defendant evidenced a preconceived design by luring Cameron within reach by promising him a toy truck in exchange for his cooperation. Considered together, these facts amply support a conclusion that the killings were deliberately planned. (See *People* v. *Hillery* (1965) 62 Cal.2d 692, 703-704 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Kemp* (1961) 55 Cal.2d 458, 472 [11 Cal.Rptr. 361, 359 P.2d 913].)

A motive for killing the boys was also clearly demonstrated. While the boys were in the closet, defendant asked their mother whether it had any other exit, and told her to keep her sons quiet because they made him nervous and because he feared the neighbors might hear them. Defendant thus demonstrated his concern that the boys might jeopardize his escape or assist in his apprehension by alarming others of his presence or informing them of his identity. The record establishes that defendant's concern was well-founded: not only were both boys able to observe defendant on that occasion, but the older boy, Keith, apparently knew defendant by name and could easily identify him. Furthermore, because Mrs. Rose lay motionless after she was attacked, defendant could have concluded she was dead; hence he could have also surmised that by killing her sons, he would eliminate the only witnesses to his crimes.

Defendant stresses that the many stab wounds were randomly inflicted, a method of killing that does not in itself establish premeditation and deliberation. (*People* v. *Anderson, supra*, 70 Cal.2d 15, 31; *People* v. *Granados* (1957) 49 Cal.2d 490, 497 [319 P.2d 346]; *People* v. *Craig* (1957) 49 Cal.2d 313, 319 [316 P.2d 947].) Although the assertion is correct, the strong additional evidence of both planning and motive in the case is more than sufficient to sustain a finding of a preconceived design. (*Anderson, supra*, 70 Cal.2d at p. 27.)

■  Defendant contends that despite the foregoing evidence of premeditation we must reverse the murder convictions because it is possible the jury based its verdict on the felony-murder theory, relying on an alleged attempted robbery that defendant asserts is unsupported by the evidence. (See *People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].) The record reveals to a virtual certainty, however, that the jury found premeditation rather than felony murder.

In convicting defendant of attempted murder in only the second degree, the jury apparently rejected proof that the assault on Mrs. Rose was a result of the commission of the alleged felonies (i.e., robbery or attempted robbery) that would have elevated the assault to an attempted murder in the first degree. Yet the attempt on Mrs. Rose's life was both temporally and causally more proximate to the alleged felonies than were the murders of her sons. We may fairly infer from the absence of a conviction for robbery or attempted robbery, and from the jurors' rejection of the proof of those crimes with regard to the attempted murder of Mrs. Rose, that they also rejected that evidence with regard to the murders of her children. We also observe that as a prerequisite to finding the special circumstance of multiple murder, the jury found the murders were intentional. (See former Pen. Code, § 190.2, subd. (c), enacted by Stats. 1977, ch. 316, § 9.) Hence it is apparent that the jury did not rely on the alleged felonies either to impute malice or to fix the degree of murder. For these reasons, and because the evidence of premeditation and deliberation is so substantial, we can be virtually certain the jury relied on that evidence, rather than on any showing of felony murder, to find that the murder of the boys was in the first degree. We conclude that the error, if any, in instructing the jury that it could predicate felony murder on attempted robbery was harmless. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 742, 765 [175 Cal.Rptr. 738, 631 P.2d 446].)[2]

### B.

■  Defendant contends the trial court abused its discretion by failing to continue the case long enough to allow effective substitution of

---

[2]For the same reason—the overwhelming evidence of intentional killings—the case at bar is an inappropriate vehicle for addressing defendant's additional contention that the felony-murder instruction (see CALJIC No. 8.21) violates statutory or constitutional requirements by presuming the element of malice aforethought from the commission of a dangerous felony. (See *People* v. *Ramos* (1982) *ante*, pages 553, 589-590 [180 Cal.Rptr. 266, 639 P.2d 908].)

counsel. We have held that a criminal defendant cannot be deprived of the opportunity to retain counsel of his choice except when bestowal of that benefit would prejudice him or unreasonably disrupt the orderly administration of justice. (*People v. Crovedi* (1966) 65 Cal.2d 199, 208 [153 Cal.Rptr. 284, 417 P.2d 868].) We have also recognized that the right to counsel is illusory if counsel, once retained, is not given a reasonable time in which to prepare the defense. (*People v. Maddox* (1967) 67 Cal.2d 647, 652-653 [63 Cal.Rptr. 371, 433 P.2d 163]; see also *Ungar v. Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921, 930, 84 S.Ct. 841].)

In this case, however, defendant was denied neither right. He was arrested on the day of the killings, October 23, 1978, and shortly thereafter retained counsel. Although trial was originally set for March 20, 1979, defendant's attorney obtained two continuances, postponing trial until April 26. Because of long-standing disagreement with his attorney regarding defense strategy, defendant filed notice of a motion to substitute counsel on April 23, having retained Michael R. Lyons on April 19. On the day of trial both previous and new counsel appeared, and the court granted the substitution motion, again continuing the case for pretrial and trial setting on May 2. On that date, the court denied Mr. Lyons' motion to continue until mid-July, and set the trial for May 18. After an administrative delay, the trial finally commenced on May 21.

Defendant gave no indication of a desire to substitute counsel until April 23, exactly six months after his arrest and three days before trial. He was then allowed to do so, and the case was continued for nearly a month to allow his new counsel to prepare for trial. In view of the research and pretrial motions already conducted by previous counsel, the prosecution's request that the case commence before the summer months when witnesses would be on vacation, and defendant's unjustified failure to request substitution until the eleventh hour, the court's refusal to further delay the proceedings was well within its discretion. (See, e.g., *People v. Duck Wong* (1976) 18 Cal.3d 178, 189 [133 Cal. Rptr. 511, 555 P.2d 297]; *People v. Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145]; *People v. Sandoval* (1977) 70 Cal.App.3d 73, 82 [138 Cal.Rptr. 609, 99 A.L.R.3d 765].)

## C.

█ A closely related contention is that defendant was not adequately represented by Attorney Lyons because the latter failed to consider

carefully the defense of diminished capacity before presenting an alibi defense that was doomed to fail. But counsel's inability to fully explore the diminished capacity defense was entirely due to defendant's refusal to submit to a psychiatric examination until just before trial. Defendant cannot complain of inadequate investigation caused by his own failure to cooperate. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 459-460 [99 Cal. Rptr. 313, 492 P.2d 1].) Furthermore, counsel's decision not to pursue the diminished capacity defense appears to have been bottomed not on a failure to investigate but on the wholly rational conclusion that as a tactical matter the defense would be unwise. First, the court-appointed psychiatrist who finally examined defendant before the prosecution rested found no basis for an insanity or diminished capacity defense. Second, those defenses would require abandonment of an alibi defense that several witnesses were willing to corroborate and that would completely exonerate defendant if believed. Third, defense counsel was aware of defendant's reluctance to call into question his own mental stability, and could have concluded that he would have difficulty securing defendant's cooperation.

Inasmuch as any inadequacy in Mr. Lyon's investigation of diminished capacity was attributable to defendant's reluctance to cooperate, we need not pause to weigh the relative strengths and weaknesses of the alibi defense against those of the possible diminished capacity argument in this case. Because the two were inconsistent, defense counsel was put to an unavoidable but difficult choice. We will not employ the advantage of hindsight to condemn his chosen path, nor will we characterize as incompetence counsel's presentation of a defense that his client elects voluntarily to offer. A defendant exercises rather than surrenders the right to make "*his* defense" (*Faretta* v. *California* (1975) 422 U.S. 806, 821 [45 L.Ed.2d 562, 573, 95 S.Ct. 2525]) when his counsel, even against his own judgment as to the better tactical approach, agrees to present the defense on which the defendant chooses to rely.

Defendant also complains that counsel provided ineffective assistance because at one point he erroneously identified the insanity defense with Penal Code section 1368, which governs the closely related subject of competence to stand trial. Counsel's inability to recall the number of a particular code section in the midst of trial is not sufficient proof of ineffective assistance. To hold otherwise would be to expand the prerequisites for competency to include an eidetic memory.

■ Defendant's final allegation of ineffective assistance in the guilt phase stems from his counsel's failure to move for a mistrial after the exclusion of an allegedly blood-stained newspaper that had been displayed to witnesses and the jury. The prosecution attempted to identify the newspaper as one that was found in defendant's house on the day of his arrest and was subsequently determined to be stained with blood. Because of gaps in the chain of custody and inability of the prosecution witnesses to positively identify the paper, however, the court ultimately excluded it and admonished the jury at length to disregard it.[3]

Defendant claims that despite the admonition, incurable prejudice had already occurred when the judge, in identifying the newspaper for the record, read out loud its date, October 19, 1978. Because defendant's alibi depended in part on his ability to associate blood stains on several items found in his house with an accidental injury to his arm suffered in mid-September 1978, he contends that reading the date of the paper completely destroyed his alibi and hence mandated a mistrial.

■ A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. (*People v. Woodberry* (1970) 10 Cal.App.3d 695, 708 [89 Cal.Rptr. 330].) Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. (*Illinois v. Somerville* (1973) 410 U.S. 458, 461-462 [35 L.Ed.2d 425, 429-430, 93 S.Ct. 1066].) Accordingly, it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance. ■ Nonetheless, defendant could conceivably prove incompetence if his counsel's omission was shown to be grounded

---

[3]The judge stated: "The court has ruled that there is insufficient evidence to show that this is the newspaper that was taken from defendant's house.

"In other words, that there is an insufficient foundation for the admissibility of this particular exhibit. So therefore, all testimony referring to that exhibit is ordered stricken from the record.

"You are to treat that particular matter as if you had never heard of it. Do you understand? It's often said it's difficult to ask a jury to unring a bell. You have heard about a newspaper that was found in the defendant's house, and you've heard some testimony about a newspaper that might or might not have contained some blood.

"But the court has ruled that there is insufficient evidence to show that the—that they're the same newspaper.

"So in fairness to the defendant, put out of your mind all references to the newspaper. Treat it as if you had never heard of it."

in ignorance or misapplication of the law rather than tactical considerations (*People* v. *Jenkins* (1975) 13 Cal.3d 749, 754 [119 Cal.Rptr. 705, 532 P.2d 857]; *People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal. Rptr. 608, 464 P.2d 64]) and if the motion for mistrial bore strong potential for success.[4] In this case, neither condition is satisfied.

■ First, the probability is slight that the judge would have granted a mistrial motion. The date of the paper was mentioned only once, when the judge briefly interrupted cross-examination of defendant to identify the paper for the record. Only an unusually perceptive juror would have retained that item of information and later deduced its prejudicial effect. Moreover, an extremely persuasive excuse would be needed to overcome the prosecution's sturdy case, yet defendant candidly admits his alibi was implausible. Finally, the jury as well as the judge heard witnesses concede their inability to positively identify the exhibit as the blood-stained paper found at defendant's house. When the judge found insufficient the proof of the paper's identity, therefore, the jury was not likely to disagree and consider the date of that paper probative of defendant's guilt.

Second, defendant offers no proof that counsel misunderstood or misapplied the law. He may very well have assessed his chances of success on the motion as minimal, and refrained from antagonizing both judge and jury with a futile gesture. Or, even if he concluded that his chances were positive, he may have refrained for fear that a second trial under less favorable circumstances would follow.

For the foregoing reasons we find no basis for defendant's claim that his counsel gave him constitutionally ineffective assistance at trial.

### D.

■ Notwithstanding defendant's arguments to the contrary, the search of his home was legitimately based on the consent of his wife. The salient facts are as follows. After defendant left the Rose residence, Mrs. Rose managed to summon the police and identify defendant as her

---

[4]Because a mistrial for evidentiary error will be granted only if the irregularity is incurably prejudicial, the ordinary prerequisite to relief on a claim of incompetence, i.e., that defendant be deprived of a potentially meritorious defense by his counsel's error (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), is automatically satisfied if the mistrial motion itself has substantial merit.

assailant. Four officers proceeded to defendant's house. Two of them arrested defendant on the front porch and detained him there for several minutes. His wife, Marlene Haskett, came to the door after the arrest and asked who the officers were and what they wanted. They responded that they were from the sheriff's office, were investigating a crime, and would like to enter the house and speak to her about it. In the presence of her husband, who remained silent, she consented to their request. Once the officers were inside, she consented to a search of the house.

After a few minutes of fruitless search one officer returned outside where he handcuffed defendant and placed him in a patrol car. According to defendant, the officer then asked for his consent to search but he refused to give it. Although the record is less than precise, it appears the officer rejoined his colleague in the house, continued to inspect commonly occupied areas with Mrs. Haskett's consent, and discovered incriminating items.

Defendant contends the above facts make this a case of first impression, and require a special rule vitiating the consent of one co-occupant when the other is present and protests the entry or search. But to paraphrase Justice Fortas, we are not so beguiled by changes in the scenery as to lose sight of principle. (*Fortson* v. *Morris* (1966) 385 U.S. 231, 249-250 [17 L.Ed.2d 330, 341-342, 87 S.Ct. 446] (dis. opn.).) In fact, the landscape before us is similar to that in the case announcing the principle we apply. In *United States* v. *Matlock* (1974) 415 U.S. 164 [39 L.Ed.2d 242, 94 S.Ct. 988], the suspect was arrested in his front yard and remained there while the police obtained consent to search from a co-occupant of the premises. The court held that a search is valid if "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*Id.* at p. 171 [39 L.Ed.2d at p. 250].) Thus the court recognized that law enforcement authorities need not seek the consent of all co-occupants before searching their commonly held property: "any of the co-inhabitants has the right to permit the inspection . . . and . . . the others have assumed the risk that one of their number might permit the common area to be searched." (*Id.* at p. 171, fn. 7 [39 L.Ed.2d at p. 250].)[5]

---

[5]Defendant's reliance on *In re Lessard* (1965) 62 Cal.2d 497 [42 Cal.Rptr. 583, 399 P.2d 39], and *People* v. *Fry* (1969) 271 Cal.App.2d 350 [76 Cal.Rptr. 718], is misplaced. *Lessard* held that in a husband's absence his wife may validly consent to a

We have recognized that the assumption of risk inherent in co-occupancy has its limits. An entry or search, even though authorized by a co-occupant, may be so intrusive that it belies the conclusion that the parties assumed or even contemplated the risk of its occurrence by deciding to jointly inhabit the subject residence. For instance, an absent cotenant cannot authorize the police to burst into occupied premises unannounced if there is no emergency justifying such a frightening intrusion. (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113]; see also *People* v. *Shelton* (1964) 60 Cal.2d 740, 745 [36 Cal.Rptr. 433, 388 P.2d 665]; *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 321-324 [82 Cal.Rptr. 348, 461 P.2d 628].)

In this case, however, the police made their identity and purpose known to defendant, in his presence sought and obtained his wife's consent to enter, and validly arrested and removed him from the house before he expressly refused consent to search. Under these circumstances, there is no basis for defendant's contention that his wife's consent was inadequate. (*Matlock, supra*, at p. 171; *United States* v. *Sumlin* (6th Cir. 1977) 567 F.2d 684, cert. den. 435 U.S. 932 [55 L.Ed.2d 529, 98 S.Ct. 1507]; *People* v. *Cosme* (1979) 48 N.Y.2d 286 [422 N.Y.S.2d 652, 397 N.E.2d 1319].)[6]

E.

Defendant next claims a denial of his constitutional right to a magistrate at his preliminary hearing. (Cal. Const., art. I, § 14.) He contends his express oral stipulation that the court commissioner could preside was ineffective because he was not informed that his acquiescence would constitute waiver of a constitutional right.

---

search, and thereby implied that the husband's presence or protest could make a significant difference. (See also *People* v. *Carter* (1957) 48 Cal.2d 737, 746 [312 P.2d 665].) *Fry* held that a wife cannot validly consent to a search once the officers are aware that her husband has instructed her to refuse permission. These cases reflect the now defunct community property principle that management and control of real and personal property are vested in the husband. (Former Civ. Code, §§ 162a, 172a, repealed by Stats. 1969, ch. 1608, § 3, p. 3313.) Under present law a wife possesses independent and coequal authority to consent to a search of commonly occupied areas. (See Civ. Code, § 5105.)

[6]We disapprove of dicta to the contrary in *People* v. *Engel* (1980) 105 Cal.App.3d 489, 498-500 [164 Cal.Rptr. 454], and *People* v. *Reynolds* (1976) 55 Cal.App.3d 357, 369 [127 Cal.Rptr. 561] (disapproved on other grounds in *People* v. *James* (1977) 19 Cal.3d 99, 106, fn. 4 [137 Cal.Rptr. 447, 561 P.2d 1135]).

Defendant cites *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed. 2d 274, 89 S.Ct. 1709], and *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal. Rptr. 577, 460 P.2d 449], as authority for the broad proposition that constitutional rights cannot be waived by a defendant who is not fully informed of their existence and content. But defendant misreads those cases. They require that the trial court inform a defendant of certain fundamental procedural rights and secure a knowing and intelligent waiver thereof before allowing him to enter a plea of guilty. (*Boykin*, at pp. 243-244 [23 L.Ed.2d 279-280]; *Tahl*, at p. 130.) Their rationale is clear: our concept of justice does not tolerate the possibility that defendants will be allowed to admit guilt and relinquish their freedom out of ignorance of basic procedural protections to which they would otherwise be entitled.

The right to have a magistrate rather than a qualified court commissioner preside at the preliminary hearing is palpably less fundamental than the rights of confrontation, jury trial, and protection from compelled self-incrimination safeguarded in *Boykin* and *Tahl*. Furthermore, there is no inherent danger here, as there is when a plea of guilty is entered, that the defendant will be irretrievably prejudiced by unknowing waiver of the underlying right. To act as magistrate at a preliminary hearing, a court commissioner must attain the status of "temporary judge." (Pen. Code, § 808; *Amos* v. *Superior Court* (1960) 182 Cal. App.2d 343, 349-350 [6 Cal.Rptr. 252], cited with approval in *Sarracino* v. *Superior Court* (1974) 13 Cal.3d 1, 10 [118 Cal.Rptr. 21, 529 P.2d 53].) Consequently, he must be a member of the State Bar and must obtain the "stipulation of the parties litigant." (Cal. Const., art. VI, § 21.) Moreover, the law as it stood at the time of the hearing required that in Los Angeles County the commissioner be appointed and supervised by the trial court and be "otherwise qualified." (Former Code Civ. Proc., § 259a, subd. 4, repealed by Stats. 1980, ch. 229, § 2.) These safeguards minimize the risk that the defendant will be incompetently tried or prejudicially affected by a commissioner acting as magistrate.

In this case, the commissioner presided only after receiving the written stipulation of the prosecution and defense attorneys, and the oral stipulation of defendant. No objection was raised to his participation until after the hearing terminated with a finding favorable to the prosecution. Under these circumstances, defendant is not now entitled to complain. (See *Estate of Lacy* (1975) 54 Cal.App.3d 172, 182 [126 Cal.Rptr. 432]; *People* v. *Oaxaca* (1974) 39 Cal.App.3d 153, 165 [114

Cal.Rptr. 178]; *Estate of Soforenko* (1968) 260 Cal.App.2d 765, 766 [67 Cal.Rptr. 563].)

## F.

Defendant claims error in the trial court's denial of his motion for a psychiatric examination of Mrs. Rose pursuant to *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 176-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].[7] If any error occurred it was harmless, because defendant was not convicted of rape.[8]

## G.

Defendant next alleges that several photographs of the slain children were improperly admitted because they were unduly prejudicial and inflammatory. "Admission of photos of victims lies within the discretion of the trial court unless their probative value is clearly outweighed by their prejudicial effect." (*People* v. *Cruz* (1980) 26 Cal.3d 233, 253 [162 Cal.Rptr. 1, 605, P.2d 830]; see also *People* v. *Jackson* (1980) 28 Cal.3d 264, 302-303 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Milan* (1973) 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 363 [105 Cal.Rptr. 138, 503 P.2d 594].) Here the trial court carefully weighed each photograph's relevance and probative value against its tendency to prejudice the jury. As a result, the court excluded several pictures found duplicative or of insufficient relevance. We have reviewed the remaining photographs and find no error in the court's judgment.

## H.

We next address defendant's claim that he was denied equal protection because the district attorney sought the death penalty in his case, while choosing not to pursue it in other, assertedly similar cases. Defendant relies by analogy on *Furman* v. *Georgia* (1972) 408 U.S.

---

[7]*Ballard* has since been legislatively overruled. (Pen. Code, § 1112, added by Stats. 1980, ch. 16, § 1.)

[8]Defendant attempts to prove prejudice by claiming that a psychiatric examination for the purpose of the rape charge would have been useful for impeaching Mrs. Rose on the other charges, and could have resulted in acquittal. Our law recognizes no entitlement to this potential secondary benefit of a *Ballard* examination. (See *In re Darrell T.* (1979) 90 Cal.App.3d 325, 335-336 [153 Cal.Rptr. 261], and cases cited.)

238 [33 L.Ed.2d 346, 92 S.Ct. 2726], holding unconstitutional death penalty procedures that left broad discretion in the sentencing authority and risked widely disparate punishments for similar offenses. But here defendant shows only that the district attorney has decided not to seek the death penalty in various cases involving other defendants, victims, witnesses, and facts. Absent a persuasive showing to the contrary, we must presume that the district attorney's decisions were legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement. (See *Gregg* v. *Georgia* (1976) 428 U.S. 153, 225 [49 L.Ed.2d 859, 903, 96 S.Ct. 2909] (conc. opn. of White, J.).)

## I.

Defendant offers no proof to support his contention that exclusion of two jurors at the guilt phase because of their opposition to capital punishment denied him the right to an impartial jury. We have recently held that absent empirical evidence in support of this contention, we will not declare the existing procedure unconstitutional. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 68-69 [168 Cal.Rptr. 128, 616 P.2d 1301].)

Defendant also contends that the exclusion of the same two jurors deprived him of the right to a jury drawn from a representative cross-section of the community. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 266-272 [148 Cal.Rptr. 890, 583 P.2d 748], and cases cited; see *Hovey*, at pp. 17-18, fn. 38.) The claim comes too late. Although the voir dire in question was conducted long after *Wheeler*, defendant failed to object on this ground to the dismissal of either juror: as to one he stipulated to exclusion because of opposition to the death penalty, and as to the other he was silent when the prosecutor moved to exclude on the same ground. In these circumstances, settled principles of appellate review preclude him from raising the point for the first time on appeal. (*People* v. *Jurado* (1981) 115 Cal.App.3d 470, 491-492, fn. 20 [171 Cal.Rptr. 509].)

## J.

At the close of the guilt phase, the prosecutor made several comments to which defendant now takes exception. Defense counsel made no objection to them at trial, however, and can complain for the first time on appeal only if timely objection and admonition could not

have obviated the prejudicial effects of the remarks. (*People v. Green, supra*, 27 Cal.3d 1, 27.) The challenged comments include an admonition to consider only the evidence adduced and not to assume there was other hidden information, an accusation that defendant had falsely identified certain shoelaces as his own, and a reference to the failure of proof that dictated exclusion of the newspaper discussed above. We need not rule on the prejudicial effect of the remarks, because we have reviewed them in context and have concluded that whatever harm they may have caused could have been cured by appropriate admonition.

### III.

Defendant makes at least one meritorious claim of prejudicial error in the penalty phase. Because reversal on this ground will require a retrial of the penalty issue, we also discuss the other penalty-phase contentions to the extent necessary for the guidance of the trial court on remand.

### A.

■ Error is evident in two instructions given to the jury at the penalty trial. The first is the so-called Briggs Instruction (CALJIC No. 8.84.2), based on current Penal Code section 190.3, which took effect after the crimes in this case were committed.[9]

In *People v. Ramos, supra, ante*, pages 553, 591, we held that the Briggs Instruction is a violation of due process because it not only distracts the jurors from their proper inquiry by inviting them to speculate regarding a discretionary function of the executive branch, but also misleads them by implying that if they find the defendant unfit ever to return to society, they can prevent the Governor from commuting the sentence by condemning the defendant to death. Although mandated by statute, the instruction is nevertheless impermissible. Because in the case at bar there was not even a legislative compulsion to inform the jury of the Governor's powers, there can be no doubt that the trial court erred in giving the instruction. (See *People v. Morse* (1964) 60 Cal.2d 631, 649-653 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

---

[9]The instruction provides in pertinent part: "You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole."

The Attorney General argues that any prejudice inherent in the Briggs Instruction was cured here when the court gave the "*Morse* instruction" regarding the parole board's powers. (See *People* v. *Morse, supra*, at p. 648.)[10] We find nothing in this instruction, however, that either commands the jury to disregard the Governor's possible future intervention or corrects the inaccuracy in the Briggs Instruction regarding the alternatives the Governor may exercise. Moreover, as will appear, in the context of this case the *Morse* instruction was not only impotent to cure the errors of the Briggs Instruction, it increased the likelihood of a prejudicial misunderstanding.

We held in *People* v. *Varnum* (1969) 70 Cal.2d 480, 491 [75 Cal.Rptr. 161, 450 P.2d 553], that the *Morse* instruction, even with its built-in admonition to refrain from speculation about the parole board's function, is totally inappropriate in a case such as this, in which the sentencing alternatives leave no discretion in the parole board. We there observed, "If the court had given the *Morse* instruction in the instant case it would have confused rather than assisted the jury. They had already been informed by both the court and counsel that defendant had been convicted of kidnaping for robbery and had been sentenced to life imprisonment without possibility of parole. We have no difficulty in conceiving their immediate perplexity if they had thereupon been fur-

---

[10]The instruction, as modified by the trial court in the language we have italicized, is as follows: "A sentence of life imprisonment with possibility of parole means that the prisoner may be paroled at some time during his lifetime or that he may spend the remainder of his natural life in prison. An agency known as the Adult Authority is empowered by statute to determine if and when a prisoner is to be paroled, and under the statute, no prisoner can be paroled unless the Adult Authority is of the opinion that the prisoner when released will assume a proper place in society and that his release is not contrary to the welfare of society. A prisoner released on parole may remain on parole for five years and if he violates the terms of the parole he may be returned to prison to serve the life sentence.

"So that you will have no misunderstandings relating to a sentence of life imprisonment with or without the possibility of parole, you have been informed as to the general scheme of our parole system. You are now instructed, however, that *the matter of parole is not to be considered by you in determining the punishment for this defendant, and you may not speculate as to if, or when, parole would or would not be granted to him. It is not your function to decide now whether this man will be suitable for parole at some future date.* So far as you are concerned, you are to decide only whether he shall be permitted to remain alive. If upon consideration of the evidence and the law you believe that life imprisonment *without the possibility of parole* is the proper sentence, you must assume that those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that they will not parole this defendant unless he can be safely released into society. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the officials will properly carry out their responsibilities."

ther informed in the suggested language of *Morse* that the rendering of a sentence of life imprisonment 'means that the prisoner may be paroled at some time during his lifetime. . . .' [Citation.] Such additional information would have been completely inconsistent with that initially received that defendant could *never* be paroled. It would have produced obfuscation, not light." In the case at bar the mystification of the jury was no doubt increased by the additional language inserted by the judge (fn. 10, *ante*), the logical implication of which is that a sentence of life imprisonment *without* possibility of parole nevertheless leaves some discretion in the parole board to release the prisoner, even in the absence of commutation. Moreover, the implication reinforced the erroneous impression created by the Briggs Instruction that although a sentence of life without parole would not eliminate the possibility of premature release of the prisoner, a death sentence would.

Because both instructions thus provided the jury with erroneous reasons to favor the death penalty, we must find the error prejudicial and reverse the penalty determination.

### B.

Defendant also asserts that misconduct inheres in certain remarks by the prosecutor at the penalty phase. One of the remarks, suggesting defendant may have committed similar offenses in the past, received no objection. The remark appears to be either appropriate or, if erroneously suggestive, capable of correction by timely admonition. (See *People v. Green, supra*, 27 Cal.3d 1, 27.)

The prosecutor made two series of remarks that were challenged at trial and are attacked again on appeal. The first was an invitation to the jurors to put themselves in the shoes of Mrs. Rose and imagine suffering the acts inflicted on her. Although appeals to the sympathy or passions of the jury are inappropriate at the guilt phase (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 319 [74 Cal.Rptr. 534, 449 P.2d 750]), at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. (Pen. Code, § 190.3; see also *People v. Bandhauer* (1970) 1 Cal.3d 609, 618 [83 Cal.Rptr. 184, 463 P.2d 408]; *People v. Vaughn* (1969) 71 Cal.2d 406, 422 [78 Cal.

Rptr. 186, 455 P.2d 122]; *People* v. *Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641].) In this process, one of the most significant considerations is the nature of the underlying crime. (See Pen. Code, § 190.3, subd. (a).) Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing.

Nevertheless, the jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason. (*Gardner* v. *Florida* (1977) 430 U.S. 349, 358 [51 L.Ed.2d 393, 402, 97 S.Ct. 1197].) In each case, therefore, the trial court must strike a careful balance between the probative and the prejudicial. (*People* v. *Terry* (1964) 61 Cal.2d 137, 144-145 [37 Cal.Rptr. 605, 390 P.2d 381]; *People* v. *Love* (1960) 53 Cal.2d 843, 856 [3 Cal.Rptr. 665, 350 P.2d 705].) On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.

We conclude that because of its obvious relevance to a moral assessment of the crime, the prosecution's invitation to the jurors to project themselves into the role of the surviving victim in this case was insufficiently inflammatory to justify reversal. Although the argument no doubt evoked an emotional response, that reaction is attributable more to the gruesome nature of the crime than to the perspective from which it was portrayed.

The remaining set of comments under attack is more troublesome. In it, the prosecutor repeatedly implied that by failing to convict defendant of rape and robbery *at the guilt phase* the jury had acted improperly, and invited the jury to correct its "wrong decision" in the penalty phase. Thus he argued:

"Now, when you think back to your deliberations, . . . I ask you to think back and each and every one of you ask yourselves, did you hesitate to vote guilty for any crime because [objection] . . . you felt you might then have to go into a penalty phase and then [interruption by the court] hold back because of that? [Objection argued and overruled.]

"And I ask you then to think back to the time that you were deliberating during the guilt phase and ask each and every one of you to consider your feelings and your thinking at the time that you were considering the issues of guilt or innocence at that time on all charges contained herein.

"And then ask each and every one of you to examine yourselves now again and your consciences and face yourselves and decide and think about whether at the time you were so deliberating you were influenced, like you should not have been, by any consideration of what might happen in the future; that is, if you had found the defendant guilty of this or that crime, you might have to go into a penalty phase, the phase we are now in, and in so doing didn't truly, fairly apply the law or fairly consider the evidence in that case during the guilt phase. [Objection.]

"And I then ask you if you found yourselves really not truly following the law or a fair judgment of the evidence, to do so now during this phase and to apply the law during this phase, the penalty phase of the trial, as the court gives it to you, properly considering all the evidence and the circumstances that were submitted to you during that guilt phase. [Objection overruled.]

"I say this to you, ladies and gentlemen of the jury, because when one considers some of the questions that were submitted to the court from you during that guilt phase, I think all of you would agree, would make one wonder as to whether the jury was properly considering the evidence or properly following the law . . . . [Objection.]

"THE COURT: Mr. Marin, I think you'd be better to discuss the evidence and the law that applies to this portion of the case and avoid the particular aspect that you're getting into now.

"MR. MARIN: Now, we know that—referring you back to the testimony of Gwendolyn Rose—that there was an assent, for example, to sexual intercourse. An assent. I didn't say consent.

"And we also know that there was no consent. Why? Because Gwendolyn Rose testified that she had intercourse with the defendant because he threatened her with a knife.

"That is not consent, as each and every one of you know.

"And if you look at the instructions of the law, you can see the answer to any question as to consent is right there in the instructions of the law. [Objection argued and overruled.]"

Later in his argument the prosecutor made the point again: "I think that it's important now for me to point out these things; that is, your deliberations and the evidence that you heard in the guilt phase to help you come to a just and proper decision in this, the penalty phase, because if you make any decision wrongly in the guilt phase, you could make the same or similar wrong decision and perhaps for the same reason [objection] in this phase. [Objection overruled.]"

Although the prosecutor's argument is unusual, we are guided by well-established principles in deciding whether it constituted misconduct: "Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.] The ultimate question to be decided is, had the prosecutor refrained from the misconduct, is it reasonably probable that a result more favorable to the defendant would have occurred." (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].)

In the case at bar, by attacking the integrity of the jury's prior deliberations without adequate justification the prosecutor went far beyond the boundaries of propriety. Of course, if he undertook only to insult the jury, he would likely prejudice the prosecution rather than the defense. But the strong suggestion that those jurors who voted to acquit on certain counts must have acted in disregard of the law and evidence carried with it the implication that the only justifiable result was conviction. Not only is that implication unsupported by the record in this case, it is an impermissible attempt to reopen the process of adjudication. In *People* v. *Terry, supra*, 61 Cal.2d 137, 145, we held that although at the penalty phase the accused could, when addressing the jury, review the evidence on which he was convicted in order to awaken any residual doubt the jurors might have had about his guilt, he had no right to attack "the legality of the prior adjudication" at that stage. We found "self-evident" the proposition that attempts to relitigate a prior finding of guilt are prohibited.

Even more obvious is the duty of the prosecution at the penalty phase to refrain from attacking acquittals or retrying charges on which the jury could not agree in the guilt phase. The court declared a mistrial on

the rape and robbery counts only after ascertaining that the jurors were truly deadlocked and that each juror believed further deliberation would not be likely to result in unanimity. Consequently, although retrial would not have been barred by the double jeopardy clause (see *Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 7-9 [22 Cal.Rptr. 649, 372 P.2d 641]; *Sturms* v. *Justice Court* (1970) 4 Cal.App.3d 36, 38-39 [84 Cal.Rptr. 69]), the prosecutor's invitation to the same jury to reconsider those unresolved charges at the penalty phase was inconsistent with the court's order of mistrial based on its finding that additional deliberation would be futile. In attempting to resolve the inconsistency, the jurors could have inferred that the additional information adduced at the penalty phase, such as the sexual assault evidence, might be used to resolve their earlier dispute, or that their assessment of the situation as intractible was based on an erroneous view of the evidence or the applicable law. Indeed, such an inference was carefully cultivated by the prosecutor throughout his argument. The jurors who had voted to acquit were thus advised that their position was legally incorrect, and they could well have been persuaded on this unfounded and misleading basis to set aside their legitimate reasons for voting as they did. The argument was thus clearly impermissible. Because we reverse on another ground, however, we find it unnecessary to assess the damage these comments may have caused defendant.

### C.

Defendant mounts a constitutional challenge to the portion of the death penalty statute that allows the jury to consider as an aggravating circumstance evidence of the defendant's past criminal activity involving violence or the threat of violence. (Pen. Code, § 190.3, subd. (b).) Defendant alleges that his right to an unbiased arbiter was denied when the jury that had already convicted him in the guilt phase of several of the crimes charged was entrusted with the responsibility of rendering an impartial verdict, under the reasonable doubt standard, regarding his guilt of an additional crime alleged at the penalty phase. (See *State* v. *McCormick* (1979) — Ind. — [397 N.E.2d 276]; cf. *Leonard* v. *United States* (1964) 378 U.S. 544 [12 L.Ed.2d 1028, 84 S.Ct. 1696]; *Donovan* v. *Davis* (4th Cir. 1977) 558 F.2d 201; *Government of Virgin Islands* v. *Parrott* (3d Cir. 1977) 551 F.2d 553, 554.) Because the issue of penalty will be determined on retrial by a jury different from the one that convicted defendant, the potential for bias of which he complains has been eliminated, and we need not reach the constitutional question in this case.

## D.

Two remaining contentions warrant only brief discussion. First, defendant challenges his attorney's competence in presenting the testimony of a court-appointed psychiatrist at the penalty phase. He asserts that the doctor's diagnosis of defendant as suffering from a compulsive sexual disorder constituted an aggravating circumstance for the jury's consideration. But the precise nature of defendant's disorder was elicited on cross-examination by the People; no attorney can fully predict what will be elicited by opposing counsel's interrogation. More significantly, on direct examination the doctor testified that defendant was mildly retarded and capable of rehabilitation, both apparently mitigating factors. Consequently, the decision to call the doctor to the stand, though of debatable effect, must be considered a matter of tactics within the discretion of the defense attorney.

Finally, defendant challenges the constitutionality of the 1977 death penalty statute on various grounds. Four members of this court rejected the substance of these contentions in *People* v. *Jackson, supra,* 28 Cal.3d 264, 315-317.

The judgment is reversed as to penalty, and affirmed in all other respects.

Bird, C. J., Newman, J., Kaus, J., Broussard, J., and Tobriner, J.,* concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it affirms defendant's conviction of two counts of first degree murder, and one count of second degree attempted murder. I respectfully dissent, however, from the majority's reversal of the penalty.

For reasons stated in my concurring and dissenting opinion in *People* v. *Ramos* (1982) *ante,* page 553 [180 Cal.Rptr. 266, 639 P.2d 908], the trial court herein did not err in instructing the jury that the Governor is empowered to commute a sentence of life imprisonment without the possibility of parole. This instruction, and a similar informational instruction regarding the power of the parole authorities to grant parole,

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

relate to matters of common knowledge to all jurors and, considering the entire record, could not possibly have prejudiced the defendant.

I also conclude that the prosecutor's remarks to the jury regarding its possibly erroneous verdict acquitting defendant of rape and robbery charges constituted, at their worst, harmless error which, reasonably, could not have affected the jury's verdict at the penalty phase.

In short, the matters complained of by the majority did not result in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

I would affirm the judgment in its entirety.