Filed 12/19/22  P. v. Bynum CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEJUAN GUY BYNUM,<br><br>    Defendant and Appellant. | 2d Crim. No. B317074<br>(Super. Ct. No. 19F-04604)<br>(San Luis Obispo County) |

Kejuan Guy Bynum appeals from the judgment entered after a jury convicted him of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.)[1]  The jury found true an allegation that he had personally used a deadly weapon – a knife. (§ 12022, subd. (b)(1).)  He admitted one prior serious felony conviction (§ 667, subd. (a)(1)) and one prior "strike" within the meaning of California's "Three Strikes" law.  (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)  The trial court sentenced him to prison for 15 years to life for second degree murder, doubled to 30

---

[1] All statutory references are to the Penal Code.

years to life because of the prior strike, plus five years for the prior serious felony conviction, plus one year for the deadly weapon enhancement. Appellant's aggregate sentence was 36 years to life.

Appellant contends that the trial court erroneously denied his motion for a mistrial. The ground for the motion was that a law enforcement witness had commented on appellant's invocation of his right to remain silent. Appellant also contends that the trial court erroneously refused to instruct the jury on the lesser included offense of heat-of-passion voluntary manslaughter.

We modify the judgment to award appellant credit for one additional day of presentence custody. In all other respects, we affirm.

*Facts*

During the afternoon on June 1, 2019, Amanda P. was inside a residence. She saw the victim, Christopher Wilson, and greeted him. Wilson hugged Amanda. She had previously had sex with him, but they had not had a romantic relationship. They were old "friends."

Amanda walked into the bedroom. Wilson "came up behind [her] and just playfully threw [her] on[to] the bed." Appellant, who was also in the bedroom, "got so angry all of a sudden." He "walk[ed] up" to Wilson and said, "'Let's go outside.'" Wilson said, "'I'm not fighting over no girl.'"

About two months before the incident in the bedroom, appellant and Amanda had a sexual encounter. Amanda regretted it and told appellant that she was not interested in him. But "he wouldn't go away." Amanda believed that appellant had become "obsessed" with her.

2

Wilson and appellant walked outside to the residence's side yard. "They were talking back and forth to each" other. Wilson said, "'What? I don't want to fight.'" Appellant "punched" Wilson "in the chest or his right shoulder." Wilson ducked to avoid a punch to the face.

In response to appellant's assault, Wilson punched him in the jaw. A witness described the blow as "bone-shattering." Appellant "dropped [to the ground]. And his face got all swole up, like, that quick." Appellant stood up and grabbed Wilson. "[Wilson] didn't do anything. [Appellant] grabbed him after [appellant] got punched."

One witness testified that, while wrestling with each other, appellant and Wilson fell through a plastic fence. Another witness testified that appellant "tackled [Wilson] through the side fence . . . into the neighbor's yard." Appellant was lying on his back. Wilson was on top of him and had him in a "headlock." Bystanders broke up the fight.

Wilson and his friend, Trevon Perry, walked to the front yard of the residence. They remained there for several minutes. Perry saw appellant walk toward Wilson. Wilson "stood his ground." Perry saw "somethin' shiny in [appellant's] hand." Appellant threw punches at Wilson's chest.

Amanda testified: Wilson was standing in the grass with his back to a tree. Appellant was "going towards [Wilson's] chest, swinging at his chest, like trying to punch him in the chest." Wilson did not punch appellant.

Someone yelled, "'Get the fuck out of my yard.'" Appellant "walked away." Wilson collapsed to the ground.

Wilson had been stabbed in the heart, shoulder, and left side of the head. The stab wound to the head caused "a fracture

3

of the left orbit," which "is the bony frame that holds the eyeball." The cause of death was "[s]harp force injuries of the head and chest." Appellant concedes that he "stabbed [Wilson] to death."

Immediately after the stabbing, appellant told a friend, "'A younger kid getting over on me, I couldn't handle it, so I had to do what I had to do.'" The friend opined that appellant was "'drunk.'"

Appellant later said, "'I can't lose a fight to little homie . . . .'" Appellant told another friend that "he took his thing and he hit him three times with it." When appellant was asked if he had any weapons in his possession, he replied that he had "ditched" the knife "'down the road from where it [the stabbing] happened.'"

Dr. Mary Genevieve, a neurologist, testified on appellant's behalf. She opined that, as a result of Wilson's punch to appellant's jaw, appellant suffered a concussion. Because of the concussion, his "brain function was disrupted."

*Appellant's Theory During Closing Argument*

During closing argument, defense counsel maintained that, in view of appellant's intoxication and concussion, he lacked the requisite intent for murder. Counsel stated: "When the DA cannot prove the required capability to have that kind of mental intent, the only result is involuntary manslaughter."

*No Abuse of Discretion in Trial Court's*
*Denial of Appellant's Motion for a Mistrial*

Before the trial began, the court granted appellant's motion to preclude law enforcement witnesses from commenting on appellant's invocation of his right to remain silent. During the trial, Detective Gower Slane testified that, after appellant was apprehended, he had spoken to appellant in the interview room

4

at the sheriff's station.  The prosecutor asked, "Was [appellant] responsive to your questions?"  Slane replied, "As responsive as I expected for him being a suspect in this type of investigation."  Defense counsel objected that Slane had commented on his client's right to remain silent.  The prosecutor protested that the question was relevant to appellant's "level of intoxication and could he communicate."  Defense counsel moved for a mistrial.

The trial court responded, "The [prosecutor's] questioning was clearly . . . aimed at determining whether [appellant] was capable of communicating, not whether he was cooperating with the investigation.  The last answer, however, got into whether he was cooperating.  To say he was as responsive as I would expect . . . a suspect in this kind of case to be, that's not talking about whether he's able to communicate, that's talking about his level of cooperation.  So I agree that that response should be stricken."

Instead of granting the motion for a mistrial, the trial court gave the following curative instruction to the jury:  "I'm going to strike Detective Slane's last answer characterizing the level of responsiveness of the defendant during their interaction on the evening in question.  [¶]  [Appellant] has and had the absolute right to remain silent.  You must not use it against him in anyway [*sic*] the implication from Detective Slane's last answer that he was less than cooperative during this interaction."

Appellant claims that the trial court prejudicially erred in denying his motion for a mistrial.  "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial."  (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

5

"Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

The trial court did not abuse its discretion. It reasonably concluded that appellant's chances of receiving a fair trial were not irreparably damaged. Detective Slane did not say or suggest that appellant had invoked his right to remain silent in response to questioning. Slane said that appellant had been as responsive as could be expected for a person in his situation. The court struck Slane's answer. It instructed the jury that appellant had an "absolute right to remain silent" and that it must not infer that he had been "less than cooperative." "'We presume the jury followed these instructions.'" (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

### *No Error in Trial Court's Refusal to Instruct on Lesser Included Offense of Voluntary Manslaughter*

Appellant argues that the trial court erred in denying his request to instruct the jury on the lesser included offense of voluntary manslaughter "based on the theory that, if he committed the charged murder[], he did so in a heat of passion." The trial court declared, "I do not believe that there was sufficient evidence or substantial evidence to support voluntary manslaughter in heat of passion."

Defense counsel responded that "there are two provocations we can point to. The first was the serious blow [to the jaw] that [appellant] sustained. . . ." The second provocation was Wilson's

6

act of throwing Amanda onto the bed.  That act made appellant "'extremely jealous.'  And it was that act that immediately prompted him to go outside and initiate the fight."

The trial court rejected counsel's argument:  "[T]he defense is putting forward two separate theories for this instruction.  The first is that [appellant] was jealous of the attention Mr. Wilson gave to Amanda . . . , but the evidence did not rise to the level of indicating that a person of average disposition, and in [appellant's] situation, would act as he did and stab someone in those circumstances. . . .  [¶]  [¶] . . . [T]he second theory . . . is that . . . at the beginning of the altercation, Mr. Wilson got the best of [appellant], and that as a result of that . . . he acted [ir]rationally and under the influence of intense emotion as being bested by Mr. Wilson.  [¶]  But . . . a defendant cannot claim provocation based on events for which the defendant is culpably responsible; in other words, provoking a fight.  And the evidence in this case is that [appellant] was provoking a fight."

On appeal appellant relies only on the "jealousy" theory:  "[T]he jury could reasonably find that appellant's obsession with Amanda led him to approach the victim in a jealous rage when the victim was playing around with Amanda on the bed.  Accordingly, appellant had an absolute right to instructions on voluntary manslaughter based on heat of passion."

"Voluntary manslaughter is 'the unlawful killing of a human being without malice' 'upon a sudden quarrel or heat of passion.'  [Citation.]  An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average

7

disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.]' [Citation.] 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.'" (*People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).)

"An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense." (*Thomas*, *supra*, 53 Cal.4th at p. 813.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense." (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

"No substantial evidence was presented that any provocation by [Wilson] was sufficient to cause an ordinary person of average disposition to be so inflamed as to lose reason and judgment." (*Thomas*, *supra*, 53 Cal.4th at p. 813.) Amanda testified that Wilson "came up behind [her] and just playfully threw [her] on[to] the bed." Wilson did not sexually assault her or make sexual overtures to her.

Moreover, appellant did not stab Wilson in reaction to his act of throwing Amanda onto the bed. "Heat of passion . . . is a state of mind caused by legally sufficient provocation that causes a person to act . . . out of unconsidered *reaction to the provocation*." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*), italics added.) Appellant stabbed Wilson in reaction to the belief that Wilson had humiliated him during the initial fight in the side yard. Other persons witnessed Wilson's delivery of a

knock-out blow to appellant's jaw. Appellant said: "'A younger kid getting over on me, I couldn't handle it, so I had to do what I had to do.'" "'I can't lose a fight to little homie . . . .'"

In addition, several minutes elapsed between the end of the fight in the side yard and appellant's recommencement of the fight in the front yard. This interval provided sufficient time for appellant's passion to cool off insofar as it had been aroused by Wilson's act of throwing Amanda onto the bed. "'[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation.]' [Citations.] Thus, it is insufficient that one is provoked and later kills. If sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored, [case law] provides no mitigation for a subsequent killing." (*Beltran, supra*, 56 Cal.4th at p. 951.)

Thus, the trial court did not err in refusing to instruct on heat-of-passion voluntary manslaughter. A reasonable trier of fact could not find that appellant had killed Wilson in a jealous rage provoked by Wilson's interaction with Amanda and that "'an average, sober person would be so inflamed that he or she would lose reason and judgment. . . .'" (*Thomas, supra*, 53 Cal.4th at p. 813.)

*Credit for Presentence Custody*

The trial court awarded appellant credit for 926 days of presentence custody. Appellant claims, and the People concede, that he is entitled to credit for 927 days. We accept the People's concession.

9

*Disposition*

The judgment is modified to award appellant credit for 927 days of presentence custody. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to send a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P. J.


BALTODANO, J.

10

Craig B. Van Rooyen, Judge

Superior Court County of San Luis Obispo

_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.