Filed 9/17/15  P. v. Hong CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040436 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. B1262087) |
| v. | |
| JIANFEI HONG, | |
| Defendant and Appellant. | |

Early in the evening on June 23, 2012, defendant Jianfei Hong was driving his white Toyota Camry from work in Cupertino to his home in San Francisco on highway 85.  Craig Ward was also driving northbound on highway 85 that evening.  Ward estimated he was driving about 70 miles per hour when he observed an accident caused by a white Camry which was being driven in an aggressive and inattentive manner.  Ward saw the other vehicle involved spinning on the highway before striking a berm, becoming airborne and flying into some trees on an embankment, killing its sole occupant, 25-year-old Arlette Alonso.  Ward followed the white Camry and wrote down its license plate number when traffic slowed ahead.  He could see the driver in the Camry's side view mirror.  According to Ward, the driver was short and wearing large sunglasses.  He called 911 and reported what he had seen, including the Camry's license plate number, which the California Highway Patrol (CHP) determined was registered to Hong at an address in San Francisco.

CHP officers responded to the registered address that evening, and located a white Camry parked near the home. The hood was warm to the touch and a large pair of sunglasses was inside the vehicle. Hong admitted he had recently driven home from Cupertino on highways 85 and 101.

Hong was convicted by a jury of felony vehicular manslaughter with gross negligence (Pen. Code, § 192, subd. (c)(1)).[1] The jury found him not guilty of fleeing the scene of a fatal accident (Veh. Code, § 20001, subds. (a), (b)(2)). After his motion for new trial was denied, Hong was placed on formal probation for three years on condition that he serve nine months in county jail.

On appeal, Hong argues: (1) there was not sufficient evidence presented for a jury to conclude beyond a reasonable doubt that his vehicle caused the accident; (2) there was insufficient evidence presented for the jury to find that Hong was grossly negligent; (3) the prosecutor committed misconduct in introducing evidence to unduly influence a witness's testimony and also by presenting evidence about the victim which appealed to the jurors' emotions; and (4) the trial court erred in excluding evidence of the victim's contributory negligence as a superseding cause of her death.

We find no error and will affirm the judgment.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

   A.    *The prosecution's case*

      1.    *Jorge Rosales's testimony*

Rosales testified he was driving northbound on highway 85 near the Evelyn Avenue off ramp during the early evening hours on June 23, 2012. As he took the off-ramp, he noticed glass, debris, oil and some other sort of liquid on the roadway, then looked and saw a car smashed into a tree on a hill on the side of the road, with smoke

---

[1] Unspecified statutory references are to the Penal Code.

2

coming from its hood. He did not see any skid marks. Rosales stopped on the shoulder and ran over to the car to see if he could help.

Rosales saw a young woman inside, with her left hand on the steering wheel and the other on her chest. He could not see any injuries, other than a little blood coming from the side of her head. Rosales started to reach inside to take her pulse, but noticed she was not moving or breathing, so he immediately called 911.

### 2. Craig Ward's testimony

Ward testified he was driving northbound on highway 85 near Evelyn Avenue on June 23, 2012, at around 6:00 p.m. He was in the leftmost of three lanes, i.e., the "fast lane," and was traveling "about 70 [mph]." Ward saw a white Camry cut in front of the car ahead of him from the No. 2 lane, causing that car to slow down. Ward had to slow as well. Ward estimated the Camry, which "[h]ad to be [going] faster than 70," cut into a space that was about one and one-half car lengths. He saw that there was another vehicle in the No. 2 lane that the Camry was attempting to get around.

After the Camry cut into the No. 1 lane, Ward saw the Camry drift back into the No. 2 lane without signaling. There was a vehicle, which Ward later learned was an Audi sedan, already in the No. 2 lane and Ward saw that the Camry and the other car were "pretty close door to door." The Camry was about halfway across into lane No. 2 and the Audi moved partially into lane No. 3 when the Camry suddenly "jumped back into the [No.] 1 lane." Ward felt the Audi was braking to avoid colliding with the Camry. He did not see the two cars make contact but believed they were close enough that they might have. Ward believed that had the Audi not moved over to avoid the Camry, "[i]t would have been a bad accident because it would have caused the car in front of me to be involved . . . and possibly myself."

Ward saw the Audi spinning on the highway, moving from lane No. 3 back into lane No. 2, then back into lane No. 3. As it drifted back into lane No. 3, it hit the curb on

3

the edge of the highway and flew up into the trees alongside the road. Ward did not see if it came out of the trees as he kept driving to try to get the Camry license number.

Ward saw the Camry move into an open space in the No. 2 lane, pass a car in the No. 1 lane and move back into the No. 1 lane. Ward followed the Camry until it got caught in traffic where highway 85 and highway 101 merge and he was able to write down its license plate number. He relayed the license plate number to a 911 operator.

Ward could only see the Camry's driver from his reflection in the side view mirror. He said the driver "seemed to be short because [he] was slumped down" and was wearing large sunglasses.

### 3. CHP Sergeant Laura Clare

Sergeant Clare was working an overtime detail on the evening of June 23, 2012, near the San Francisco-Oakland Bay Bridge. She received a notification to be on the lookout for a white Toyota Camry registered to an address in San Francisco that was involved in a hit and run traffic accident with a fatality. Hong was listed as the registered owner of the Camry. Sergeant Clare drove to the registered address and arrived there between 7:20 and 7:30 p.m.

Sergeant Clare located the Camry parked a couple houses away from Hong's address. After waiting for another CHP unit to arrive, she got out of her vehicle and touched the Camry's hood, finding it was still warm. Sergeant Clare went to Hong's address and knocked on the door. Hong answered and she asked him for identification. Hong confirmed that the Camry parked on the street belonged to him. Sergeant Clare asked him about his whereabouts that day and Hong told her he had just come home from work in Cupertino. He told her he usually drives home on either highway 101 or 280 and, on this day, he drove home on highway 101.

### 4. CHP Officer Joshua Lapoint

Officer Lapoint testified he was on patrol on June 23, 2012, when he received a call shortly after 6:00 p.m. to respond to a collision on highway 85 near the Evelyn

4

Avenue off-ramp. After arriving at the scene, Officer Lapoint looked for defects or obstructions in the roadway but saw none. He noted the weather was warm and sunny with clear skies. The section of highway where the accident occurred was straight, slightly inclined, with good visibility. From the collision, Officer Lapoint observed tire friction marks on the roadway, along with debris from trees and shrubs where the vehicle had run into the landscaping on the embankment. He also saw debris from the vehicle dispersed "all over the off-ramp, on the side of the embankment."

Following the trail of tire marks and debris down the embankment, Officer Lapoint saw a white Audi resting upon a tree, facing south. He determined the Audi impacted the tree on the driver's side and it had sustained substantial damage. The driver was a young Hispanic woman, who was fatally injured and was declared dead at the scene.

While en route to the accident, Officer Lapoint received a dispatch that there was another vehicle involved in the accident and a witness (Ward) had provided a license plate number for that vehicle. When he arrived on the scene, Officer Lapoint called Ward and confirmed that the vehicle linked to the license plate number matched the description of the vehicle Ward was reporting was involved in the accident. When it did, Officer Lapoint asked dispatch to notify CHP in San Francisco about the white Camry with the license plate number provided by Ward.

Officer Lapoint went to the address himself and saw the white Camry, which was being taken for evidence. He inventoried the property found inside, which included a large pair of sunglasses, like those Ward said the driver of the vehicle was wearing. Officer Lapoint also spoke to Hong and his wife at the address. Hong told him he had left work at 6:00 p.m. in Cupertino and drove home to San Francisco, taking highway 85 to highway 101.

Officer Lapoint prepared a "24 hour profile"[2] of the victim, which is a "record of the person's life 24 hours before the incident, what did they do, what was their state of mind, were they under the influence of any kind of drugs or alcohol, the people they were with, what was their mood." He testified that such profiles are compiled "[t]o rule things out, particularly, suicide or bizarre behavior, things of that nature."

### 5. CHP Officer Kylle Rose

Officer Rose qualified as an expert in vehicle collision investigation and accident reconstruction and was called in to investigate the fatal accident on June 23, 2012. Officer Rose took photographs at the scene, which showed the Audi's roofline collapsed and its trunk sheared off when the vehicle collided with the tree. Alonso was still secured in the driver's seat with her seatbelt.

Officer Rose examined the tire friction marks on the roadway and concluded the Audi was driving northbound when it began to rotate clockwise, ultimately facing the wrong way. According to Officer Rose, once the front of a vehicle deviates from its original direction of travel by about 20 degrees, the driver no longer has control. Officer Rose testified the tire marks were consistent with what Ward described seeing at the time of the accident.

### 6. Coroner's testimony

Dr. Joseph O'Hara, a forensic pathologist with the Santa Clara Medical Examiner's Coroner's office, testified that he conducted an autopsy on Alonso and determined the cause of death was "blunt force injury of the head with a skull fracture." Alonso also had a broken collarbone, broken ribs on both sides of her body, as well as

---

[2] The prosecution also called Alonso's mother, Christina Alonso, and sister, Carla Alonso, as witnesses to testify about Alonso's activities and their observations of her mood during the 24 hours preceding her fatal accident. The substance of their testimony is discussed in more detail in connection with Hong's argument that the testimony was unduly prejudicial and its introduction amounted to prosecutorial misconduct.

6

multiple abrasions and contusions. Dr. O'Hara found no evidence that Alonso had used any drugs (illegal or common prescription) or consumed any alcohol.

B.   *Defense case*

Hong did not testify. He did not present evidence from any percipient or expert witnesses. Hong proffered an expert witness to testify regarding the tire tracks, but that evidence was excluded by the trial court following an Evidence Code section 402 hearing.[3]

C.   *Jury deliberations, verdict and sentencing*

During deliberations the jury asked to review Ward's testimony on direct examination when exhibit No. 4 was discussed.

The jury found Hong guilty of count 1, felony vehicular manslaughter with gross negligence (§ 192, subd. (c)(1)), but found not true the allegation that he fled the scene of the accident within the meaning of Vehicle Code section 20001, subdivision (c). The jury also found Hong not guilty of count 2, leaving the scene of an accident resulting in permanent serious injury or death (Veh. Code, § 20001, subds. (a), (b)(2)).

Hong's motions for new trial and to reduce his conviction to a misdemeanor were denied and he was placed on three years' formal probation and ordered to serve nine months in county jail. Various fines and fees were imposed along with other conditions of probation, none of which have been challenged in this appeal.

II.   **DISCUSSION**

A.   *Sufficiency of the evidence*

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence

---

[3] The trial court's ruling on this issue, as well as the substance of the expert's proffered testimony, will be discussed in detail below.

7

which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*Ibid.*) Nor do we ask whether we " 'believe[] that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; see *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' "].)

1.     *Identification of Hong's white Camry*

Hong first argues the prosecution failed to prove beyond a reasonable doubt that he caused the accident because no reasonable jury could have concluded that Ward correctly identified his white Camry as the vehicle involved in this incident. We disagree.

Hong relies on *People v. Arias* (1996) 13 Cal.4th 92 (*Arias*), which lists the five factors to be evaluated in deciding if misidentification occurred: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description by the witness; (4) the level of certainty displayed by the witness at a suggestive confrontation; and (5) the length of time between the crime and the confrontation. (*Id.* at p. 168.) He contends that Ward never saw the driver's face but could only describe the car he was driving. Ward admitted he was shocked at the time of the accident. When he began to follow the white Camry, it was already some distance ahead of him and Ward did not testify that he made any effort to ensure he was following the same white Camry.

Hong's reliance on *Arias* is misplaced. In *Arias*, the California Supreme Court was discussing, among other things, what factors a court should use in deciding whether to allow an in-court identification when the defendant raises the possibility that the process used to elicit an out-of-court identification was unduly suggestive. (*Arias*, *supra*, 13 Cal.4th at p. 168.) Hong did not bring an in limine motion challenging the admissibility of Ward's identification of his vehicle, nor was there any evidence raising the possibility that Ward's identification of that vehicle was influenced by any extraneous factors.

Substantial evidence supports the jury's finding that Hong was the person driving the white Camry that caused the fatal accident. Ward testified he first saw the white Camry when it made an unsafe lane change in front of him, which caused Ward and the car in front of him to brake in order to avoid a collision. He then saw the Camry slowly drift into the second lane, causing Alonso to move over and apparently lose control of her vehicle. While Ward may not have kept his eyes firmly fixed on the Camry this entire time, the jury was entitled to believe his testimony that the vehicle he began to follow immediately after watching the Audi fly off the highway was the same white Camry that caused the accident.

To the extent that Ward's memory of the incident was uncertain as to some of the details, such as the exact color and make of the vehicle that was forced off the road by the white Camry, Hong was able to elicit those uncertainties on cross-examination and the jury was able to evaluate Ward's credibility as it related to his description of the manner in which the Camry was operated.

Furthermore, Ward's testimony was corroborated by the evidence provided by the CHP officers who testified that the license plate number he provided was issued to a white Camry registered to Hong at his residence in San Francisco. When CHP officers inventoried the contents of Hong's Camry, they located large sunglasses inside, similar to those Ward said the driver was wearing.

9

Consequently, Ward's testimony, as a whole, was not categorically incredible and a rational trier of fact could rely on it to find Hong guilty of the charged offense.

### 2.    *Gross negligence*

Hong next argues there was insufficient evidence presented to the jury to support its finding of gross negligence.  Ward testified that Hong was driving more than five miles an hour over the speed limit and drifted slowly into Alonso's lane.  Drivers are accustomed to being cut off or accidentally cutting off other drivers and understand that the consequences usually include collision, horn honking or angry gestures and expressions.  Hong posits a reasonable person would not expect a driver to react so violently as to spin out, cross multiple lanes of traffic and fly into the air.

Here, the jury was instructed on gross negligence as follows:  "Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment.  A person acts with gross negligence when, one, he acts in a reckless way that creates a high risk of death or great bodily injury, and, two, a reasonable person would have known that acting in that way would create such a risk.  In other words, a person acts with gross negligence when the way he acts is so different from how an ordinarily careful person would act in the same situation that his act amounts to disregard for human life or indifference to the consequences of that act."

In *People v. Bennett* (1991) 54 Cal.3d 1032, the California Supreme Court explained that "[g]ross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.  [Citation.]  'The state of mind of a person who acts with conscious indifferences [*sic*] to the consequences is simply, "I don't care what happens." ' [Citation.]  The test is objective:  whether a reasonable person in the defendant's position would have been aware of the risk involved."  (*Id*. at p. 1036.)  Simply committing a traffic violation, by itself, is generally insufficient to establish gross negligence, but "[t]he jury should . . . consider all relevant

10

circumstances . . . to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence." (*Id*. at p. 1038.)

The evidence presented here was sufficient to permit a jury to find that Hong was grossly negligent on the day of the accident.

First, Hong was driving his car at a high rate of speed, well in excess of the 65 mile per hour speed limit. His argument that Ward's testimony established that he was only exceeding the speed limit by perhaps as little as five miles an hour mischaracterizes that testimony. Ward testified that *he* was driving at about 70 miles per hour when Hong passed him on the right. If Hong passed Ward, he must have been traveling faster than 70 miles per hour.

In addition to the high rate of speed, the jury heard Ward testify that Hong, without signaling, cut into a small space, perhaps one and one-half car lengths, in front of the car ahead of him, causing both that car and Ward to slow to avoid a collision. Finally, after drifting into Alonso's lane and quickly jerking back into his own lane, Hong again moved into the second lane--which was now clear since Alonso's car was spinning out of control and off the highway--and essentially leapfrogged the vehicle that was impeding his progress in the first lane. It is within a juror's common experience to evaluate whether a driver who operates his vehicle in such a manner, at speeds in excess of 70 miles per hour, is demonstrating conscious indifference to the consequences of his actions. The jury's finding that Hong acted with gross negligence is supported by substantial evidence.

### B. *Prosecutorial misconduct*

Hong contends the prosecutor committed misconduct in two ways: (1) by submitting an exhibit (exhibit No. 4) which depicted the way in which Hong's vehicle was moving just before the accident and using it to unduly influence Ward's testimony; and (2) by eliciting prejudicial evidence of the victim's background designed to play on the jurors' emotions.

11

### 1. Relevant facts

#### a. Exhibit No. 4

The prosecutor prepared a diagram which purported to show the path of the white Camry as described by Ward. It was marked for identification as exhibit No. 4 and the prosecutor asked Ward if it accurately represented what he observed the day of the accident. After Ward said it did, the prosecutor sought to admit the diagram into evidence and publish it to the jury. At that point, Hong's counsel raised a relevance objection. Following an unreported sidebar conference, the trial court sustained the objection on the ground that no foundation had been laid.

The prosecutor then asked Ward if the diagram accurately depicted the configuration of highway 85 with three lanes of travel, and whether the boxes and arrows on the diagram accurately reflected the positioning and movement of certain vehicles on the road, including the white Camry and the Audi. He confirmed that it did, and the prosecutor again moved that the exhibit be admitted into evidence and published to the jury. Hong's counsel did not object and the exhibit was admitted.

#### b. Testimony by victim's family members

Christina, Alonso's mother, and Carla, Alonso' sister, testified about Alonso's activities, as well as their interactions with her and their assessment of her emotional state, during the 24 hours preceding the accident. Christina testified Alonso "was like happy all the time," and lived at home following her graduation from college in Merced. Alonso was working part-time at the Coach store in the Stanford shopping center and part-time at a nightclub operated by Christina's brother-in-law. Alonso had just "got a new position at her work" sometime before the accident and was excited about her job prospects. She also was planning to accompany Carla to Arizona for college orientation on June 25. Christina saw Alonso early in the morning on June 23 as Christina was preparing to go to work, and talked to her about buying presents for Alonso's twin cousins who were having their sixth birthday party that day.

12

Carla testified she went shopping with Alonso on June 23 to buy presents for their cousins and then went with her to the birthday party. Alonso drove to the party and they arrived around 1:00 or 2:00 in the afternoon. They spent three or four hours at the party, during which time Alonso was happy and excited to see her family. Nothing unusual occurred at the birthday party, and there was no alcohol served. Alonso was also going to accompany Carla to her upcoming orientation at the University of Arizona. Alonso left the party by herself around 6:00 p.m. and said she was going to the Coach store to exchange a purse for a family member and then go to work. On cross-examination, Carla said that Alonso was wearing shoes when she left, but could not remember what kind.

Hong's counsel objected during Christina's testimony on the grounds of relevance and prejudice. Following an unreported bench conference, the trial court overruled the objection. At a subsequent break in the proceedings, outside the presence of the jury, the parties memorialized what was discussed at sidebar regarding Hong's objection. After restating Hong's objection that Christina's testimony about Alonso's "state of being or . . . happiness" was not relevant, the prosecutor responded that Christina's testimony was "foundational . . . information that the investigating officer in this case took from the family members as part of what's called a 24 hour profile. 24 hour profiles are commonly taken in this kind of case where the victim cannot be interviewed because the victim is deceased in determining whether there is some other factor in the collision, attempted suicide, or depression, or alcohol use, drug abuse, things of that nature."

        2.    *Analysis*

Misconduct involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) It is misconduct for a prosecutor to mischaracterize the evidence (*People v. Hill* (1998) 17 Cal.4th 800, 823), misstate the law (*People v. Bell* (1989) 49 Cal.3d 502, 538), or appeal to the passion of the jurors (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250). "[A] prosecutor commits reversible misconduct if he or she makes use of 'deceptive or

13

reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights--such as a comment upon the defendant's invocation of the right to remain silent--but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on a different ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Reversal is required "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.)

The People contend Hong forfeited his claims of prosecutorial misconduct, because he failed to make any such objection at trial,[4] either when the prosecution sought to admit exhibit No. 4 into evidence or when Alonso's family members were testifying. We agree. Hong objected to both exhibit No. 4 and Christina's testimony only on the grounds of relevance. He made no objection or argument about prosecutorial misconduct with respect to either of these subjects. Accordingly, Hong's claims of prosecutorial misconduct related to this evidence were forfeited.

Even if these claims could be deemed to have been preserved in some way, they are without merit. With respect to exhibit No. 4, even if the diagram was misleading in some way or conflicted with Ward's testimony, Hong was able to address any such

---

[4] Typically, " '[t]o preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Silva* (2001) 25 Cal.4th 345, 373.)

14

discrepancies during cross-examination. Christina's testimony, while certainly emotional, does not rise to the level of a deceptive or reprehensible method such as to qualify as misconduct. Furthermore, based on the entirety of the evidence presented to the jury in this case, there is no reasonable probability Hong would have obtained a more favorable outcome even in the absence of the purported misconduct.

### C. *Preclusion of evidence of superseding cause*

Hong next argues the trial court erred in not permitting him to introduce evidence tending to show Alonso's contributory negligence was an intervening superseding cause of the fatal accident.

#### 1. *Relevant facts*

Hong sought to introduce the testimony of an accident reconstruction expert, Joel Salinas, regarding his analysis of the tire tracks. The trial court held an Evidence Code section 402 hearing, at which Salinas testified that he believed Alonso could have come to a stop before leaving the road if she initially applied her brakes when the white Camry drifted into her lane. The prosecutor objected to any testimony about what occurred after the Camry entered Alonso's lane because it would be inadmissible evidence of contributory negligence. The trial court agreed, finding "any evidence of whether or not the victim did or did not break, [*sic*] whatever the stopping distance may have been . . . is irrelevant. I believe it goes to contributory negligence, and it is not a superseding, independent event. So any testimony with regard to what happened after the cause of the incident will be excluded."

The trial court said it would allow Salinas to testify regarding his measurements of the highway and how they differed from those taken by the CHP investigator. That evidence was ultimately presented to the jury by way of a stipulation.

#### 2. *Analysis*

" '[P]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' " (*People v. Schmies* (1996) 44

Cal.App.4th 38, 48-49.) An intervening superseding cause can relieve a defendant of criminal liability if the act "break[s] the chain of causation" (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953) and the defendant's act is no longer a substantial factor in producing the injury. "[A] 'cause of the [death of the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur.'" (*People v. Schmies*, *supra*, at p. 48.)

In *People v. Armitage* (1987) 194 Cal.App.3d 405, 421 (*Armitage*), the defendant caused a drunken victim to end up in the middle of a dangerous river clinging to an overturned boat, and subsequently argued it was reckless for the victim to abandon the relative safety of the boat and attempt to swim to shore. Like the defendant in *Arimtage*, Hong contends that Alonso's unforeseeable and violent reaction to his driving halfway into her lane caused her to lose control of her vehicle, spin out on the highway and fly into the trees on the side of the road. Hong's expert would have testified that Alonso could have safely stopped her vehicle before leaving the highway if only she had applied her brakes.

The Court of Appeal rejected this claim in *Armitage*, stating, "the panic-stricken victim['s] [response] . . . was not a wholly abnormal reaction to the perceived peril of drowning." (*Armitage*, *supra*, 194 Cal.App.3d at p. 421.) "[I]n criminal law a victim's predictable effort to escape a peril created by the defendant is not considered a superseding cause of the ensuing injury or death. [Citations.] As leading commentators have explained it, an unreflective act in response to a peril created by defendant will not break a causal connection. In such a case, the actor has a choice, but his act is nonetheless unconsidered. 'When defendant's conduct causes panic an act done under the influence of panic or extreme fear will not negative causal connection unless the reaction is wholly abnormal.'" (*Ibid.*)

In this case, Hong's expert was precluded from offering testimony about how Alonso's failure to apply her brakes, after she swerved to avoid Hong's car which was drifting into her lane as they both traveled on a highway at a high rate of speed, was an independent superseding cause of her death. This was entirely proper. Alonso reacted to a sudden peril and took evasive action, veering to the right to avoid colliding with Hong's car. Whatever actions she took or failed to take in response to Hong driving into her lane, so long as they were not " 'wholly abnormal,' " were not sufficient to break the chain of causation and cannot be raised as a defense. (*Armitage*, *supra*, 194 Cal.App.3d at p. 421.)

D. *Hong's claim of other evidentiary errors have been forfeited*

Hong also raises an argument suggesting that he is being punished for a crime for which he is not "morally responsible." In this portion of his brief, he discusses comparative negligence in civil actions and then states that it is somehow "inhuman and unenlightened" for a defendant, such as himself, to be found guilty of vehicular manslaughter in a situation where the decedent's negligence was equal to or greater than that of the defendant. Hong claims he should have been allowed to present evidence Alonso was actually accelerating before the collision and was "trying to pass a car at an unsafe speed that's in the process of changing lane [*sic*]," along with evidence that she "possibly had a mechanical malfunction in her car, or [her] missing sandal possibly caused the fatal accident."

With the exception of Alonso's footwear, Hong made no offer of proof at trial regarding the possibility that Alonso was trying to pass Hong when he moved into her lane or that there was any mechanical reason for the accident. Hong proffered his expert to testify that Alonso could have safely come to a stop had she braked and that her failure to brake was an independent superseding cause of her death. The expert did not offer any evidence about what Alonso may or may not have been doing in the moments preceding the near-collision between her car and Hong's Camry. The trial court simply excluded

17

any testimony about what Alonso might have or should have done in response to Hong drifting into her lane.  Since these claims of evidentiary error were not raised in the trial court, they are forfeited on appeal.  (Evid. Code, § 353; *Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486.)

III.    **DISPOSITION**

The judgment is affirmed.

_____

                                                Walsh, J.*

WE CONCUR:


_____

          Rushing, P.J.


_____

          Elia, J.


People v. Hong
H040436

_____

        * Judge of the Santa Clara County Superior Court assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.