Filed 10/5/16 P. v. Thomas CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT EARL THOMAS III,<br><br>    Defendant and Appellant. | B258695<br><br>(Los Angeles County<br>Super. Ct. No. BA406843) |

APPEAL from a judgment of the Los Angeles Superior Court, Kathleen Kennedy, Judge. Affirmed.

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Andre Lowe was shot and killed during a fight outside a club in Hollywood. Video recordings made by people at the scene captured images of a man pointing a gun toward Lowe at the time shots were fired, as well as the license plate of the car the same man then drove over Lowe's body. Based on the video footage and other evidence, police identified Robert Earl Thomas III as the shooter. A jury convicted Thomas of first degree murder and found true gang and firearm allegations. The trial court sentenced Thomas to state prison for a term of 50 years to life.

Thomas appeals, arguing his counsel provided ineffective assistance by failing to object when a police officer, familiar with Thomas' criminal record, testified during cross-examination that she checked to see whether Thomas was "still in custody" before telling a detective investigating the Lowe murder that she recognized the shooter as Thomas, and by failing to seek a mistrial when the detective testified he contacted "a parole agent" after Thomas became the focus of the investigation. Because we conclude defense counsel's performance fell within the wide range of reasonable professional assistance, that defense counsel's actions were reasonable strategic decisions, and that Thomas cannot establish the strong potential for success of a mistrial motion, as is required, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

Lowe and Marrshawnn Smith were leaving the Empire Club in Hollywood shortly after 2:00 a.m. on January 13, 2013, when someone "banged on" Smith, asking Smith, "[W]here are you from[?]" The man asking the question stated that he was from Carver,[1]

---

[1] The Carver Park Compton Crips gang claims territory roughly framed by the 105 Freeway to the north, Wilmington Avenue on the east, El Segundo Boulevard to the south and Central Avenue to the west.

and, according to Smith, "a lot of faces started appearing right after that."  There was "fighting everywhere."  Several people hit Smith before he heard gunshots.  His friend Lowe was shot twice in the back of the head and died from his wounds.

Two TMZ videographers stationed outside another club across the street filmed the "melee" through the time of the shooting.  In addition, a parking valet (Mohammed Natshe), who was using his cell phone to videotape some of the fighting, heard gunshots and hid behind the nearest car (a Porsche Cayenne).  Natshe saw three men running towards the Cayenne and believed they had been involved in the shooting.  The person running toward the driver's side of the Cayenne was holding a gun.  Natshe saw that individual get into the Cayenne and drive the car over the person on the ground (Lowe).  Natshe recorded the Cayenne's license plate and ran alongside the car to record the three occupants.[2]

That morning TMZ posted a video of the shooting on its website, along with a "screen grab"—a "still" image taken from the video.  On the still image, TMZ had added a yellow arrow pointing to a man extending his arm at the time gunshots were heard and placed a red circle around the gun in the man's hand.  The man wore a gray "Pink Dolphin" brand sweatshirt with a red, white and blue graphic design and "dolphin insignia" on the front and a white t-shirt showing at the collar and bottom of the sweatshirt—the same clothing worn by the Cayenne's driver in the Natshe video.

After watching the TMZ and Natshe videos, Los Angeles Police Department (LAPD) detectives identified the Cayenne's registered owner (Deloris Oden) and sent a surveillance team to look for the car.  Officers found the Cayenne parked at Oden's residence in south Los Angeles later that morning and impounded it.  Delores Oden told a detective her grandson Dion was the one who drove the car.  However, Dion Oden's aunt said she had seen Dion and the Cayenne at the house the night before, but Dion was in his girlfriend's Honda, and "Juicy" was driving the Cayenne.

---

[2]	Both Smith and Natshe spoke with police that night, and Natshe provided the video of the "shooter" as he ran to the Cayenne.

A detective confirmed Dion Oden was a Carver Park gang member, but when he compared Dion Oden's DMV photograph to the TMZ and Natshe videos, he saw that the Cayenne's driver at the time of the shooting was a "completely different person." Informed that Juicy may have borrowed the Cayenne, the detective then looked for Carver Park gang members associated with Dion Oden. He found that Thomas was one such associate, and Thomas' "monikers o[r] nicknames" were "Juicy" or "Juice." When the detective printed out Thomas' DMV photo, he was "100 percent positive" Thomas was the shooter and the driver of the Cayenne in the videos, noting in particular Thomas' hairline, facial features and profile.[3] The detective gathered additional video footage from other cameras in the area; using video footage from a nearby business (Exhale), he was able to track the movements of the Cayenne's three occupants, outside the coverage of the TMZ cameras, as they moved through the crowd before driving away in the Cayenne.

Meanwhile, Los Angeles Sheriff's Department (LASD) homicide detective Traci Healy was investigating a different murder and had come into contact with Thomas. While watching television news coverage of Lowe's murder in Hollywood earlier that morning, she heard that "TMZ had caught the shooting on camera" and had the video footage on its website. Detective Healy watched the video and saw the still photo on her computer. She recognized the shooter to be Thomas. An LAPD detective investigating Lowe's murder happened to call Detective Healy the same morning approximately one to two hours after Detective Healy had seen the video. Detective Healy informed the detective that she recognized Thomas as the shooter. She had known Thomas since 2009 and had seen Thomas more than 20 times since that time.

---

[3] After listening to the recording from Natshe's cell phone several times, the detective believed he could hear a male voice say: "Hey Juice, open the door, cuz." The recording was transcribed as: "Hey wait, hold on, hold on (inaudible). Open the door, open the door[,] cuz."

Natshe was shown a six-pack photographic lineup with Thomas' photograph in the sixth position. Natshe chose the fourth and sixth photographs and signed the following statement: "The guy I saw get in the car with gun looks like #4 or #6. More like #4." Three days later, on January 16, 2013, Thomas was arrested in Las Vegas.

Thomas was charged with first degree murder (Pen. Code,[4] § 187, subd. (a)), with allegations he had personally and intentionally discharged a firearm which caused great bodily injury and death (§ 12022.53, subd. (d)), and the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).

At trial, the People presented evidence of the facts summarized above.[5] The jury viewed the TMZ, Natshe and Exhale video footage as well as still images from these videos. Testifying as the TMZ video was played, one of the lead investigators (Detective George Bowens) pointed out where Lowe could be seen in a fist fight just before the man in the Dolphin sweatshirt (Thomas) extended his right arm with a gun in his hand and aimed at the back of Lowe's head from a distance of two to three feet, followed by the sound of gunshots (at 2:07 a.m. according to one of the videos bearing a timestamp).

In addition, a forensic print specialist testified he processed the "entire" Cayenne, but there was only one usable print in the car's interior. That print was located on the wood trim to the left of the door release handle on the driver's door and was a match with Thomas' right thumb print.[6] Swabs of red stains found on the Cayenne's left fender and wheel wells matched Lowe's DNA profile.

---

[4]     All statutory references are to this code.

[5]     An LASD gang expert opined the shooting outside Carver Park territory was committed in association with and for the benefit of the Carver Park Compton Crips.

[6]     In photographs found on Thomas' cell phone, he wore the same gray "Jordan nines" athletic shoes worn by the Cayenne's driver in Natshe's video.

Another beating victim (Anthony Hale) testified he was "jumped" as he left the Empire Club; as the TMZ video played, he pointed out where a man wearing a blue and white jacket and a knit hat punched and kicked him; the Cayenne's rear passenger in the Natshe video wore this type of clothing and hat. Swabs of red stains on the back of the headrest facing the rear passenger matched the DNA profiles of Hale and another individual seen wearing a similar jacket and hat and flashing a Carver Park gang sign in a photograph. Photographs of Thomas' cousin (and Carver Park gang member) Vontaye Davis, with whom Thomas was arrested in Las Vegas, resembled the Cayenne's front seat passenger.

The defense called Thomas' son's mother (Winifred "Adela" Najee-Ullah) and a friend (Victoria Gregory), both of whom testified Thomas wore a white Hollister sweatsuit with "HOLLISTER" printed across the chest in blue to the club on the night of the shooting. Thomas wore the same outfit in a photograph of Thomas, Najee-Ullah and their son, taken at their son's birthday party earlier that day. During a conversation between Najee-Ullah and Thomas recorded at the Las Vegas jail, Najee-Ullah told Thomas (calling him "Juicy") the shooting was "all on the news" and that she and their friends had seen the TMZ video. Najee-Ullah told Thomas someone referred to the video as the "Juicy TMZ video" and that people were saying "that was Juicy on the video."[7] Both Najee-Ullah and Gregory admitted during cross-examination that the first time they told anyone else Thomas was wearing different clothing from the shooter in the video was when the defense investigator contacted them 16 months later (in May 2014). Najee-Ullah testified she took photographs at the club that night and Thomas may have been in some of them, but claimed she lost her phone seven months after the shooting.

Thomas testified in his own defense, acknowledging his Carver Park gang membership. He also acknowledged his prior convictions for possession of a stolen

---

[7] Gregory acknowledged she saw the TMZ video on the morning of the shooting, and by the next day or so, she saw pictures of Thomas posted to the website and knew Thomas was being accused of the shooting.

vehicle in May 2009, and attempted first degree burglary in November 2009. He said he had not changed his clothes after his son's birthday party before going to the Empire Club the night of the Lowe shooting.[8] Thomas testified he was never at Dion Oden's house or in the Cayenne on the day of the shooting and denied he had ever driven the car. He said he had gone to the club with Andre Storey in Storey's CLS 550 Mercedes Benz and drove Storey home in that car because Storey was too drunk to drive. Thomas claimed he could see himself—meaning his "all white outfit" but not his face—driving Storey's car (with Storey in the passenger seat and no one else in the car) in the Exhale video. He denied hearing any gunshots that night, but claimed his cousin (Vontaye Davis) called him at 2:11 a.m. and told him someone had been shot at the club. Thomas testified he did not know anyone was looking for him as the shooter until the police arrived at his aunt's house in Las Vegas; he claimed he made no calls on his cell phone after the morning of the shooting because his battery died and he did not have a charger.

During Thomas' cross-examination, the jury heard a recorded conversation between Thomas and his father after Thomas called from the Las Vegas jail, saying he needed to speak with "Adida [sic, Adela]." Thomas father stated, "you out there again . . . you don't pay attention . . . . You supposed to be raising your son, man." When Thomas told his father that "you can't talk over this phone," Thomas' father said, ". . . I know that, but I mean, they got your name all on the news—all on—on—on the news." Thomas told his father that Thomas needed to get in touch with his mother. Over Thomas' repeated interruptions of "Daddy, daddy, daddy," Thomas' father said, "getting caught up with . . . [t]hem knucklehead ass niggas out there, boy. . . . I told you about that—that damn shit already, boy. You don't—you don't—you don't listen. [Y]ou being a fool out there."

In rebuttal, Detective Bowens testified that, after receiving a photograph of Andre Storey taken the night of the shooting and reviewing the video evidence from that night,

---

[8]     He was wearing the same white Hollister sweatshirt when he was arrested three days after the shooting (on January 16, 2013).

7

he had determined that the person driving Storey's car was wearing the same clothing Storey wore that night, namely, an all white outfit (but without "Hollister" or anything else across the front) and a green jacket with a white fur collar. The man in this clothing could be seen in the video, standing on the street and then sitting in the driver's seat of the car, with one female passenger in the front seat and another in the back.

The jury found Thomas guilty of first degree murder (§ 187, subd. (a)) and found true the firearm (§ 12022.53, subd. (d)) and gang (§ 186.22, subd. (b)(1)(C)) allegations.

The trial court sentenced Thomas to state prison for a term of 50 years to life (25 years to life for the murder count, plus 25 years to life for the firearm enhancement).

Thomas filed a timely appeal.

## DISCUSSION

Thomas's sole contention on appeal is that his trial counsel rendered ineffective assistance in failing to object on the first occasion, and then failing to request a mistrial the second time a law enforcement witness "voluntarily alluded to [his] criminal record."[9] He argues the jury's receipt of such prejudicial information requires reversal. He is mistaken.

A.    *Controlling Legal Principle*

Both the United States and California Constitutions guarantee the criminal defendant's right to the effective assistance of counsel. (*People v. Vines* (2011) 51 Cal.4th 830, 875.) To establish a claim of ineffective assistance, "'a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was

---

[9]    Thomas acknowledges the failure to object forfeits such claims on appeal. (*People v. Carrasco* (2014) 59 Cal.4th 924, 965 ["the defendant may not argue on appeal 'that the court should have granted a mistrial he did not request'"], quoting *People v. Chatman* (2006) 38 Cal.4th 344, 368.)

8

prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.' [Citation.]" (*People v. Johnson* (2015) 60 Cal.4th 966, 980; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

A reviewing court "must indulge a strong presumption that [defense] counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.) Counsel's decisionmaking must be evaluated in the context of the available facts, and tactical errors are generally not deemed reversible. (*Id.* at p. 690.) "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Carrasco*, *supra*, 59 Cal.4th at p. 985; accord, *People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

Similarly, while a mistrial should be granted if the trial court is apprised of prejudice an admonition or instruction would not cure, "'[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198; accord, *People v. Edwards* (2013) 57 Cal.4th 658, 703.) Consequently, as our Supreme Court has explained, "'it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 380.) Nevertheless, a defendant "could conceivably prove incompetence" (1) "if his counsel's omission was shown to be grounded in ignorance or misapplication of the law rather than tactical considerations" *and* (2) "if the motion for mistrial bore strong potential for success." (*People v. Haskett* (1982) 30 Cal.3d 841, 854-855, fn. omitted; accord, *People v. Burnett* (2003) 110 Cal.App.4th 868, 883.) The defendant must satisfy both conditions. (*Haskett*, *supra*, at pp. 854-855; *Burnett*, *supra*, at p. 883.)

It is the defendant's burden on appeal to establish the inadequacy of trial counsel. (*People v. Vines*, *supra*, 51 Cal.4th at p. 875.) A reviewing court will reverse a conviction on the ground of inadequate counsel only if the record on appeal affirmatively demonstrates trial counsel had no rational tactical purpose for his or her act or omission.

9

(*Id.* at p. 876.)  If the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we must reject the claim and affirm the judgment, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.  (*Ibid.*)

B.      *Relevant Proceedings*

The first instance of allegedly deficient performance occurred when defense counsel was cross-examining Detective Healy, after she testified she recognized Thomas when she saw the TMZ video and still image on the day of the shooting.[10]

Defense counsel then asked Detective Healy:  "So . . . when you see somebody you recognize . . . you don't make a call to [your supervisor or colleague] or anyone else[;] . . . you wait on Detective [Herman] Frettlohr [an LAPD detective investigating Lowe's murder] to call you.  Correct?"  Detective Healy responded, "[Y]ou are taking it out of context.  You are taking it out of timeframe.  What happened was, I saw the video; I checked to see if Mr. Thomas was still in custody; the detective called.  At that point I said to him, 'I recognize the shooter to be Robert Thomas.'"  At that point, defense counsel interrupted the witness and continued his cross-examination without objecting to her testimony.[11]

---

[10]      In a sidebar discussion before Detective Healy testified, the prosecutor told the trial court the witness "was the lead investigator in the other murder that [Thomas] was part of."  "I have told the detective that she is not to mention the other case or anything to that effect. . . .  And I warned her that when defense asks her questions regarding that and she answers it, that's his doing."  When defense counsel requested "parameters," the trial court stated:  "She cannot refer to any other case[ and c]annot refer to the fact that [Thomas] was in court."  The prosecutor responded:  "As long as [defense counsel] [does not] ask the questions, I am not going to do that."  The trial court then told defense counsel:  "[F]rom your perspective, the shorter she is on the stand[,] the better."

[11]      Thomas argues there could have been no tactical reason not to object to Detective Healy's statement.  To the contrary, Thomas' trial counsel could reasonably conclude that objecting at this point would only emphasize the reference to whether Thomas was "still in custody" in a way that would not be helpful to the defense (see *People v. Harris* (2008)

10

The second incident took place during the prosecutor's direct examination of LAPD Detective Frettlohr, who testified that after Dion Oden's aunt said Juicy was driving the Cayenne the night of the shooting, the focus of the investigation shifted to Thomas. The prosecutor then asked, "What if anything did you do as a result of that?" Detective Frettlohr responded, "[W]e contacted a parole agent, and we obtained a phone number." Defense counsel objected, and the trial court called counsel to confer at sidebar. The prosecutor said she had told the witness not to mention "priors and stuff like that unless the defense opens the door" and had tried to structure her questions in a leading way, but defense counsel objected, so she was forced to ask open-ended questions and "g[o]t in trouble."

The trial court told the prosecutor her questioning was "sloppy," the witness was "not a neophyte," and that it was "not [defense counsel's] fault." After admonishing the prosecutor, the trial court asked defense counsel, "[w]hat do you want me to do about

43 Cal.4th 1269, 1290), whereas the ambiguity of the fleeting reference allowed for the possibility the jury may have understood the "custody" reference to relate to Thomas' arrest for Lowe's murder if they took note of it at all, leading trial counsel to allow the statement to pass without objection (see *People v. Padilla* (1995) 11 Cal.4th 891, 958 [the "defense counsel's failure to object was probably a conscious tactical decision and a sensible one at that, taken so as not to draw the jury's attention to remarks that were, in context, fleeting"], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823).

Citing *People v. Asbury* (1978) 173 Cal.App.3d 362, 365, Thomas observes that, in cases where counsel objects to evidence on one ground (unsuccessfully) but not another meritorious ground, the possibility the failure to object was a tactical decision is rebutted. We reject Thomas' unsupported assertion the "same reasoning applies where counsel objects on one occasion to a category of evidence, but fails to object on another occasion to the same type of evidence." Certainly, defense counsel could reasonably conclude there was no need to object to a single ambiguous reference one day but conclude otherwise upon the repetition of similar testimony and in light of the circumstances five days later. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 690, italics added ["a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct*"]; accord, *People v. Jennings*, *supra*, 53 Cal.3d at p. 379.)

11

that, if anything?" Defense counsel responded, "Just better left unsaid." The court then said, "Okay. Let's keep going."

Later, Thomas testified in his own defense and admitted his two prior convictions for possession of a stolen vehicle and attempted residential burglary; he admitted he was sentenced to prison for the burglary. Thomas also explained that the reason he did not want to talk to his father during the recorded conversation in the Las Vegas jail was that he knew his father was going to be "more disappointed" that he was "back in jail" and "didn't feel like hearing [his] father preach at [him]"; he wanted "soothing," so he wanted to talk with his mother.

Then, in his closing argument, defense counsel told the jury: "There is no doubt about it, they are not playing fair. . . . A person has a constitutional right not to testify. They exercise that right for various reasons. One reason is, when you take the stand your credibility can be attacked by certain convictions that you have. Not all convictions, but certain convictions. Detectives know that you are not supposed to mention somebody being on parole because . . . it exposes—what if he didn't testify?" Defense counsel continued, "*I didn't make a big deal about it because I knew [Thomas] was taking the stand in his own defense*."[12] (Italics added.) "But that detective, as long as he has been a detective[,] knows you don't come in here and mention somebody is on parole. . . . He knows that. But he did it anyway. They are not playing fair . . . in this case. Detective Healy comes in and tells you 'I wanted to see if he was still in custody.' Same thing. It prejudices a person who is exercising his right. If he exercises his right not to testify, for whatever reason, it prejudices that person. You know he is on parole; you know he is in custody. They are not playing fair. And that goes throughout this case."

---

[12]     In fact, defense counsel began his opening statement speaking as Thomas himself: "My name is Robert Earl Thomas. I am 23 years old. And I would like to take this opportunity to tell you what the evidence in this case will show. The evidence in this case will show that I am not the person in this video. No matter how much the People, the prosecution would like you to believe that that is me, I am emphatically, without hesitation, telling you that that is not me in the video."

C.      *Thomas' Ineffective Assistance Claim Is Meritless*

Thomas argues defense counsel was ineffective in failing to seek a mistrial on the grounds that two police witnesses had "committed blatant misconduct" by improperly testifying Thomas had been in custody and on parole. He contends an admonition could not have cured the harm caused by the misconduct, the trial court "would have" granted a mistrial, and there was "no downside" to a mistrial motion.

There are several problems with this argument. First, Thomas' premise that there was "no downside" to seeking a mistrial is flawed. When a mistrial is granted on the defendant's own motion, he or she consents to a retrial. (*Cardenas v. Superior Court* (1961) 56 Cal.2d 273, 276 ["The defendant's motion for a mistrial, where it is granted by the court, operates as a waiver of the claim of once in jeopardy."].) In his assessment of the progress of the trial and the jury's receptiveness to his case, defense counsel may have determined Thomas' best option was to proceed with the trial underway, rather than seeking a retrial.[13] (*People v. Haskett*, *supra*, 30 Cal.3d at p. 855 ["even if [the defense counsel] concluded that his chances were positive, he may have refrained for fear that a second trial under less favorable circumstances would follow"].)

Moreover, "[t]he California Supreme Court has consistently found vague and fleeting references to a defendant's past criminality to be curable by appropriate admonition to the jury." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 955 [and cases cited therein], petn. for review pending, petn. filed Aug. 2, 2016; *People v. Ledesma*

---

[13]      "'A defendant may choose not to move for or consent to a mistrial for many reasons. He may be of the opinion that no error in fact occurred, or if it occurred, that it was not prejudicial. . . . Indeed, even when a palpably prejudicial error has been committed a defendant may have valid personal reasons to prefer going ahead with the trial rather than beginning the entire process anew, such as a desire to minimize the embarrassment, expense, and anxiety mentioned above. These considerations are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare.' [Citation.]" (*Stanley v. Superior Court* (2012) 206 Cal.App.4th 265, 291.)

(2006) 39 Cal.4th 641, 683 ["We find no basis for concluding, on the present record, that the knowledge that [the] defendant previously had been convicted of murder and sentenced to death was incurably prejudicial."]; see, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 123 [fleeting reference to jail was not so inherently prejudicial an admonition would not have cured it]; *People v. Bolden* (2002) 29 Cal.4th 515, 554 [answering a question about the defendant's address, a police officer mentioned the Department of Corrections parole office; denial of motion for mistrial affirmed].)

In *People v. Jennings*, *supra*, 53 Cal.3d 334, for example, as a result of three volunteered, nonresponsive answers by witnesses, the jury learned the defendant had previously been arrested and been in prison. (*Id.* at pp. 374-375.) Following the admission of these statements, the trial court asked whether the defense counsel wanted the matter remedied by admonition, instruction or stipulation, but added, "'we can just drop it, of course, depending on what your perception is of that testimony and how it's being viewed by the jury.'" (*Id.* at p. 380.) "From this statement," the *Jennings* court explained, "we can infer that the trial court did not consider the three isolated incidents of blurted-out, nonresponsive answers incurably prejudicial. We agree with this implied assessment of the potential prejudice and conclude counsel was not remiss in failing to move for a mistrial." (*Ibid.*)

Similarly, viewing the circumstances as they stood at the time of Detective Frettlohr's testimony,[14] Thomas' trial counsel could have reasonably concluded that, while objectionable, the two brief remarks, made five days apart, in the context of a lengthy trial, were insufficient to establish incurable prejudice. After unequivocally acknowledging the reference to a parole agent to be "totally improper," the trial court asked defense counsel what he wanted the court to do "if anything," supporting the inference that the trial court did not consider the incident incurably prejudicial. It follows

---

[14] *People v. Jennings*, *supra*, 53 Cal.3d at p. 379; *People v. Ledesma* (1987) 43 Cal.3d 171, 216 [we must assess the reasonableness of counsel's acts or omissions under the "circumstances as they stood at the time that counsel acted or failed to act"].

14

that Thomas' trial counsel was not remiss in failing to move for a mistrial. (*People v. Haskett*, *supra*, 30 Cal.3d at p. 855 [defense counsel may have assessed his chances of success as minimal and refrained from making a futile gesture]; see *People v. Navarrete* (2010) 181 Cal.App.4th 828, 836 ["a trial court can almost always cure the prejudice of an improperly volunteered statement by granting a motion to strike and charging the jury with an appropriate curative instruction"].)

Furthermore, as part of Thomas' trial strategy, he later established his criminal record and incarceration history through his own testimony (*People v. Stinson* (1963) 214 Cal.App.2d 476, 480 ["A defendant is free to balance the value of his own testimony against the possible disadvantage of jury knowledge of his criminal record."]). In addition, Thomas attempted to explain his failure to deny his involvement in the murder during the jail call with his father by saying that his father was disappointed Thomas was "back in jail" and that Thomas did not want to hear his father "preach." (See *People v. Collins* (2010) 49 Cal.4th 175, 199 [as part of his trial strategy, the defendant admitted his recent incarceration and criminal history and chose to explain his conduct by acknowledging he was on parole and did not want to get caught with a gun].)

Citing *People v. Bowen* (1971) 22 Cal.App.3d 267, 291, among other cases, Thomas concedes courts have held any prejudice from the erroneous mention of the defendant's prior conviction is cured when the defendant testifies and admits his prior convictions, but argues "the failure to obtain a mistrial forced [his] hand."[15] The problem

---

[15] On this record, Thomas' reliance on *People v. Stinson*, *supra*, 214 Cal.App.2d 476 as the "better reasoned case" is misplaced. In *Stinson*, after a police officer testified he spoke with a defendant's parole officer, the defense counsel moved for a mistrial. The trial court struck the answer, instructed the jury to disregard it and reserved ruling on the motion. (*Id.* at p. 479.) After the prosecution rested, the defense counsel renewed the mistrial, indicating the defendant would testify if the trial court denied the motion. (*Id.* at pp. 479-480.) Stating the matter would be considered upon a motion for new trial if necessary, the trial court denied the motion; the defendant went on to testify, admitting his prior convictions and parole status. (*Id.* at p. 480.) Under these circumstances, the *Stinson* court held the defendant *had not forfeited the argument* on appeal that evidence of his prior criminal history was erroneously admitted by testifying, finding his "hand

for Thomas is that defense counsel explained: "I didn't make a big deal about it"—specifically referring to Detective Healy's testimony she checked to see if Thomas was "still in custody" and Detective Frettlohr's testimony he contacted a parole agent once Thomas became the focus of the investigation—"because I knew he was taking the stand in his own defense." Thomas claims there is no way of knowing if this statement was true, or if counsel would have changed his mind if the testimony had not come in, and the decision was Thomas', not defense counsel's, in any case. The point is that defense counsel expressly stated his decision was a tactical one (see *Strickland v. Washington*, *supra*, 466 U.S. at p. 690 [tactical errors are generally not deemed reversible]), which defeats Thomas' contrary speculation. (*People v. Vines*, *supra*, 51 Cal.4th at p. 876 [reviewing courts will reverse convictions on direct appeal raising ineffective assistance claim """"only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission"""""]).

"Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 691.) As he correctly observes, a defendant has a constitutional right to testify on his own behalf (*Rock v. Arkansas* (1987) 483 U.S. 44, 51 [107 S.Ct. 2704, 97 L.Ed.2d 37]), and the ultimate decision whether to testify belongs to the defendant, not counsel (*People v. Bradford* (1997) 15 Cal.4th 1229, 1332). "The defendant may exercise the right to testify over the objection of, and contrary to the advice of, [the] defense counsel." (*Ibid.*) Whether Thomas wished to testify in his own defense, as was his right, or defense counsel advised Thomas to do so in light of the strength of the evidence against him (and the weakness of his defense to that point), the jury would have learned of his criminal history in either event, and there would have been

was forced." (*Id.* at p. 481.) On its merits, however, in light of a trial record "point[ing] emphatically to [a] defendant's guilt," the defendant could not establish he was prejudiced as a result. (*Id.* at p. 482; see also *People v. Collins*, *supra*, 49 Cal.4th at p. 199 [given the limited nature of the improper remarks preceding the defendant's own testimony, his argument he might have proceeded differently "is not persuasive"].)

no reason to pursue a mistrial. (See *People v. Ledesma*, *supra*, 39 Cal.4th at p. 684, fn. 8 [in matters upon which reasonable counsel might differ, "we decline to second-guess the strategic decisions of [the] defense counsel"].)

Even without Thomas' own testimony, the record suggests that, as a matter of trial strategy, defense counsel purposefully chose not to take further action at the time Detective Frettlohr mentioned contacting a parole agent. Defense counsel responded to the trial court's question whether he wished to take further action by stating, "Just better left unsaid." Defense counsel later highlighted in his closing argument both instances of the prosecution's witnesses unfairly referring to Thomas' criminal record as further evidence supporting the defense theme throughout the case that the prosecution witnesses and evidence could not be trusted. From his statements during the trial, it is apparent defense counsel was well aware of the applicable law and, in the context of compelling video and other identification evidence, addressed the improper statements in the manner he concluded best served the defense strategy.[16]

Because Thomas cannot show his counsel's failure to request a mistrial was "grounded in ignorance or misapplication of the law rather than [based on] tactical considerations" and cannot show that a mistrial motion "bore strong potential for success," as is also required (*People v. Haskett*, *supra*, 30 Cal.3d at pp. 854-855; accord, *People v. Burnett*, *supra*, 110 Cal.App.4th at p. 883), his argument counsel was ineffective for failing to request a mistrial necessarily fails. (See *People v. Collins*, *supra*, 49 Cal.4th at p. 198 [a motion for mistrial should be granted only when a party's chances of receiving a fair trial have been irreparably damaged]; *People v. Franklin*,

---

[16]    His opening statement introduced the theme of doubting the evidence, telling the jury, for example, "you would also expect" to find Dion Oden's or Delores Oden's fingerprints in the car but instead only Thomas' print was found inside, suggesting it had been planted. In his closing argument, he went on to argue the law enforcement witnesses had lied on the stand and told the jury not to put its faith in the video alone, stating, "[t]his is Hollywood." Further, he pointed out the prosecution did not have a single witness or receipt to prove Thomas had a Dolphin sweatshirt.

17

*supra*, 248 Cal.App.4th at p. 955 ["it is only in the 'exceptional case' that any prejudice from an improperly volunteered statement cannot be cured by appropriate admonition to the jury"].)

## DISPOSITION

The judgment is affirmed.

GARNETT, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.