Filed 10/3/16; pub. order 10./28/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B258517 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA130524) |
| v. | |
| VINCENT ANTHONY TATUM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Reversed.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

———————————

Vincent Anthony Tatum (Tatum) appeals from the judgment entered on his convictions of first degree murder and first degree attempted murder. Tatum asserts (among other claims) that the trial court erred in denying his motion for a mistrial. We agree, and we reverse.

## BACKGROUND

Tatum and Devin Lowe (Lowe) grew up in the same neighborhood in south Los Angeles. Tatum lived on 119th Street, and Lowe lived on 115th Street. They had been friendly acquaintances for years, but beginning in March 2013, their relationship deteriorated; they had disagreements about "money," and "all type[s] of things." In the summer of 2013, Tatum warned Lowe to stay away from the neighborhood, and in a separate incident, Tatum brandished a weapon in front of Lowe.

On the morning of October 17, 2013, Lowe's half-brother Victor Valentine (Valentine) drove to Lowe's home to pick up Lowe to go the gym. As Lowe waited for Valentine to arrive, he saw Tatum "flying up and down the street" in his car. Valentine picked Lowe up shortly before 8:30 a.m., and when Valentine's car reached the intersection of 120th and Avalon Streets, Tatum pulled his car alongside Valentine's car and began verbally harassing Lowe and Valentine. According to Lowe, Tatum was angry. Valentine asked Tatum if he wanted to fight, and Tatum agreed, suggesting that they meet to fight on 121st Street. Valentine drove to 121st Street, where Lowe and Valentine encountered a friend, sitting on the hood of his car, parked next to the curb. Valentine parked, and he and Lowe exited the car and spoke with the friend.

Approximately five minutes later, Tatum drove down 121st Street, parked his car on the opposite side of the street from them, exited the vehicle, and walked across the street towards Valentine and Lowe. Tatum carried a gun, but Valentine and Lowe were unarmed. The three began arguing; Tatum demanded money and threatened to shoot them, stating that Lowe and Valentine should not be around the neighborhood. The brothers decided to leave and got into Valentine's car. Tatum shot the back tire of the car and fired a second time, striking Lowe. Although Valentine attempted to drive away, his car struck another car and became inoperable. Tatum walked up to the car and resumed

2

firing into the vehicle. He shot Lowe and Valentine multiple times. Valentine died as a result of his injuries.

Los Angeles County Sheriff's deputies responded to the crime scene. Believing that Lowe would not survive his injuries, a deputy interviewed him at the scene and he identified Tatum as the shooter. Investigators recovered multiple bullet fragments and cartridge casings from the scene and the vehicle. The ballistics evidence showed that the shooter was "very close" to the car when he fired. Police arrested Tatum shortly thereafter.

An information charged Tatum with first degree murder (Pen. Code, § 187, subd. (a);[1] count 1), first degree attempted murder (§§ 187, subd. (a), 664; count 2) and firearm allegations. The information further alleged that Tatum had suffered prior seven felonies within the meaning of section 1203, subdivision (e)(4), one felony within the meaning of section 667.5, and one felony within the meaning of the "Three Strikes" law. Tatum pleaded not guilty.

The jury convicted Tatum of first degree, premeditated and deliberate murder, first degree attempted murder, and found the firearm allegations true. The court sentenced Tatum to a total of 114 years in prison. Tatum filed a timely appeal.

## DISCUSSION

**1.    Facts**

On the first day of voir dire, the court informed the first group of prospective jurors that they would be judging the credibility of the witnesses and that they would receive instructions on how to assess a witness's credibility. The court later elaborated: "The law says that you can't prejudge anybody. You can't automatically give somebody more credibility or automatically give them less credibility before they even take the stand. And I always use this example—and I'm sorry if somebody here is a plumber, but I've had horrible experiences with plumbers. I've just had horrible—during remodels or whatever, just horrible experiences. So if I hear somebody is coming in, and I hear he's a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

3

plumber, I'm thinking, 'God, he's not going to be telling the truth.' So obviously I have already prejudged that person, and I wouldn't be able to be fair. Everyone who takes the stand, you start at the same position. Now, once they get up on the stand and they testify, that's when you start to use your skills about judging credibility." The court clarified that once a witness begins testifying, "you can start to evaluate. But you can't do it beforehand."

Tatum's counsel moved for a mistrial based on the court's comments about plumbers. Defense counsel explained that "when the court was using the example about the plumber, and you said that you would not believe any plumber if he came in to testify, our alibi witness is a plumber." The court denied the mistrial motion, stating, "I could certainly tell the jury that was by way of example, and that's a personal thing." The court also asked Tatum's counsel if she wanted the potential jurors admonished regarding the plumber. Tatum's counsel declined the offer, "I'm just going to make a tactical decision to leave it alone. I'd rather not accentuate it in their minds."

The next day, another group of potential jurors was brought in for voir dire. The court repeated the instructions concerning how to evaluate a witness's credibility but omitted her personal anecdote about plumbers.[2] At the outset of the trial, the court instructed the jury to "[k]eep an open mind throughout the trial. Do not make up your mind about the verdict or any issue until after you have discussed the case with the other jurors during deliberations. Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." The court also told the jury that "[y]ou alone must judge the credibility or believability of the witnesses" and listed various factors to consider in making that determination. The court further instructed that "[y]ou must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or

---

[2] According to Tatum's counsel, six of the jurors empanelled in the case heard the court's remarks about plumbers.

none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe."

Tatum's alibi witness was Major Lee Goulsby (Goulsby), a plumbing contractor who had owned Speedy Plumbing 2000 for 10 years. Goulsby testified that he was friends with Tatum, and called him if he needed manpower: "he's one of my first men that I call." Goulsby testified that Tatum was working for him at a job involving a lot of demolition on October 17, 2013, the day Valentine was killed and Lowe was shot. Tatum was at the office when Goulsby arrived at 7:30 a.m. or 8:00 a.m. Goulsby drove him to the job around 9:00 a.m., and Tatum was at the site the entire day. Asked, "[w]ould you lie for [Tatum] today because you don't want to see him get in trouble?," Goulsby replied, "Never." On cross-examination, Goulsby testified that when a detective called to tell Goulsby that Tatum was wanted for murder, Goulsby hung up the phone without telling the detective that Tatum had been with him on the day Valentine was shot, and did not call Tatum to tell him he was wanted for murder. The prosecutor asked Goulsby if he already knew his friend (Tatum) was wanted, because he had been with him after the shootings, and Goulsby said he didn't recall.

In closing, the prosecutor argued that Goulsby was lying. Goulsby was Tatum's "buddy," and "he's here to help [Tatum], not hurt [Tatum]." "[Y]ou have a false alibi, where . . . Goulsby just is not a credible person." "[I]t's easy to get up, take an oath, and help out a friend. Very easy. It's very easy to do that." The defense argued that Goulsby had a chip on his shoulder because he had been subpoenaed and had to miss work, and his testimony was credible. In rebuttal, the prosecutor argued that Tatum subpoenaed only Goulsby rather than other workers because "[i]n this case there's only one person willing to lie, and that was . . . Goulsby."

After the trial, the court repeated the instructions on witness credibility and the jury's duty to disregard the court's statements about the facts and the witnesses.

2.      **Analysis**

Tatum complains that the court denied him due process and a fair trial when it made comments about plumbers and erred when it denied Tatum's motion for a mistrial

5

after being apprised of the fact that Tatum's alibi witness was a plumber. In Tatum's view, the trial court's comments usurped the jury's function to determine the credibility of the witnesses. We agree.

"Denial of a motion for a mistrial is reviewed for abuse of discretion and should be granted '"only when a party's chances of receiving a fair trial have been irreparably damaged."'" (*People v. Panah* (2005) 35 Cal.4th 395, 444.) "'"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*People v. Lucero* (2000) 23 Cal.4th 692, 713–714.)

"A California trial court may comment on the evidence, including the credibility of witnesses, so long as its remarks are accurate, temperate, and 'scrupulously fair.' [Citation.] Of course, the court may not express its views on the ultimate issue of guilt or innocence or otherwise 'usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses.' [Citation.] The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made." (*People v. Melton* (1988) 44 Cal.3d 713, 735.) "The danger of judicial comment is that the jury is likely to place too much reliance on the judge's opinion of how to resolve a factual issue." "'[T]he members of the jury are apt to give great weight to any hint from the judge as to his opinion on the weight of the evidence or the credibility of the witnesses. . . .'" "'[J]urors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word.'" (*People v. Cook* (1983) 33 Cal.3d 400, 407–408, overruled on other grounds by *People v. Rodriguez* (1986) 42 Cal.3d 730, 770.)

In this unusual case, the trial court made extended remarks to prospective jurors, including six of those eventually empanelled, that she had had "horrible experiences with plumbers," and "if I hear somebody is coming in, and I hear he's a plumber, I'm thinking, 'God, he's not going to be telling the truth.'" The defense alibi witness, Goulsby, was a plumbing contractor. Goulsby testified that Tatum was working for him on a plumbing

6

job site the entire day on the date Tatum was alleged to have shot Lowe and Valentine.[3] If the jury believed Goulsby, Tatum was not guilty. But six members of the jury had heard the trial court advise them *that the court herself would not believe a plumber who testified*. Goulsby's credibility was a central issue. The prosecutor directly challenged Goulsby's credibility on cross-examination, asking why he had not told a detective that Tatum was working for him on the day of the shooting. The prosecutor argued forcefully in closing that Goulsby was not credible and was lying to help his friend. The court's statement that plumbers who came into court were liars validated the prosecutor's argument, irreparably damaging Tatum's chance of receiving a fair trial. The comment by the court expressed the court's view on the credibility of Tatum's alibi in a trial where Tatum's alibi was his only defense. When, as here, the trial court comments on the credibility of defense witnesses, this "allows the jurors to discredit and disbelieve such witnesses without determining the question of credibility in accordance with proper instructions." (*People v. Oliver* (1975) 46 Cal.App.3d 747, 753.) As a result, "the jury did not function as the sole and exclusive arbiter of the credibility of the prosecution witnesses and the guilt or innocence of [Tatum]. The trial court's remarks exceeded the scope of proper judicial comment permitted by section 10 of article VI [of the California Constitution], and interfered with [Tatum]'s constitutional right to a jury trial. [Citation.] Reversal of [Tatum]'s conviction is, therefore, mandatory." (*People v. Cook*, *supra*, 33 Cal.3d at p. 412.)

The court abused its discretion when it denied the motion for a mistrial. This is especially true as defense counsel moved for a mistrial on the first day of voir dire, when granting a mistrial or dismissing the jury panel would not have caused undue delay. No admonition or instruction could have cured the prejudice that resulted from the trial court's statement that it believed a plumber would lie in court, when Tatum's alibi witness was a plumber who the prosecution argued came to court to lie for his friend.

---

[3] The prejudice caused by the anti-plumber remarks could also affect Tatum, who worked on plumbing jobs for Goulsby.

Under these circumstances an instruction would have been as ineffectual as the famous words spoken by the Wizard of Oz, "Pay no attention to that man behind the curtain!" (The Wizard of Oz (Metro-Goldwyn-Mayer Aug. 25, 1939).)

## DISPOSITION

The judgment is reversed.


JOHNSON, J.


I concur:


CHANEY, J.

ROTHSCHILD, P. J., dissenting:

No doubt the trial judge should not have shared her personal anecdote about plumbers during jury voir dire. Nonetheless, in my view, the court's comments about plumbers did not usurp the jury's function as the judges of witness credibility. And appellant has not shown the trial court abused its discretion when it denied his motion for a mistrial based on the court's statements.

The record does not support the majority's characterization of the judge's comments. I do not think the jurors could have reasonably understood the court's statements to mean that plumbers are liars or that jurors should not believe them. " 'The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made.' " (*People v. Linwood* (2003) 105 Cal.App.4th 59, 73.) Here, viewed in its full context, the point of the court's statement was to show how people, including the court, have biases based on their personal experiences and that the jurors must put them aside when they hear the testimony: As the court stated, only when the witness begins testifying, then "you can start to evaluate. But you can't do it beforehand." And just as the court had to put aside her bias against plumbers, she told the jurors they would have to put aside any bias they might have against certain categories of people who might testify in the case (including plumbers). Thus, the judge used the anecdote merely to caution the jury not to apply group prejudices or prejudge witnesses. And not, as the majority claims, to advise the jury that "the court herself would not believe a plumber who testified" or "that plumbers who came into court were liars." (Maj. opn. *ante*, at p. 7, italics omitted.)

Further, both before the testimony began and again before deliberations, the court instructed the jury on the specific factors for evaluating the credibility of witnesses, telling them they were the sole judges of the credibility of the witnesses; significantly, the court instructed them not to take anything it had said as an indication of how to evaluate the facts, the witnesses or how to decide the case. Given these instructions, it is not reasonable to assume that when the jurors heard the alibi witness say he was a plumber, they were reminded of the court's personal anecdote and thought the judge said

"plumbers who came into court were liars," (maj. opn. *ante*, at p. 7) this guy is a plumber, so he must be a liar. On the contrary, we presume the jury followed the court's instructions to evaluate his testimony and credibility based on his statements and demeanor in court without applying group prejudice, prejudgment or the court's personal biases about plumbers. (*People v. Montes* (2014) 58 Cal.4th 809, 888.)

I also disagree with the majority's conclusion that a timely admonition would not have cured any prejudice. Once the court learned that appellant's alibi witness was a plumber, the court could have addressed the issue in the moment, instructing the jury, for example, "Ladies and gentlemen, defense counsel informs me that a defense witness is a plumber. I used the example of my bias about plumbers as a way of emphasizing how we might have biases against people for different reasons, and we need to put them aside when it comes to hearing the testimony in this case. I will instruct you separately on the factors you should use to evaluate a witness's credibility. You should do so based on those factors, not based on any bias that I or you may have towards others." Such an instruction would have immediately clarified the point of the comment, and dispelled any prejudice.

Any possible prejudice from the comment could also have been addressed through juror voir dire. Counsel (or the court) could have asked the potential jurors questions to determine whether the jurors heard the judge's comment about plumbers and if they did, to explore the extent to which the remarks about plumbers gave rise to any prejudice against appellant. And counsel could have then used juror challenges to remove individual jurors whose responses indicated bias or prejudgment notwithstanding the court's clarification and admonishment. Appellant's lawyer did not do any of these things, nor did she ask the court to conduct such an inquiry of the jury.

Significantly, counsel declined the court's offer to give any admonishment to the jury. And having lost the motion for a mistrial, counsel made the tactical choice to do nothing else. Appellant should not now be heard to complain about the potential consequences of counsel's strategic decision. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 653 [a defendant may not challenge on appeal alleged shortcomings in the trial

2

court's voir dire of the prospective jurors when the defendant, having had the opportunity to alert the trial court to the supposed problem and to fix it, decides not to do so].)

Finally, " ' [w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.)  The judge, of course, was present and knew the tone and manner in which she spoke and could see the reactions of the jurors to her comments.  Based on the totality of the circumstances as reflected in the record, the court's decision to deny the motion for a mistrial does not appear to be beyond the bounds of reason.   In my view, appellant was not denied due process or a fair trial, and the trial court did not abuse its discretion.  Accordingly, I would affirm the judgment.


ROTHSCHILD, P. J.

Filed 10/28/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B258517 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA130524) |
| v. | CERTIFICATION AND ORDER FOR PUBLICATION |
| VINCENT ANTHONY TATUM, | |
| Defendant and Appellant. | |

The opinion in the above-entitled matter filed October 3, 2016, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


CHANEY, Acting P. J.                    JOHNSON, J.

4